655 S.E.2d 126

**STATE of West Virginia ex rel. Lambert Turner JONES, II, and Red Jones Auto Mart, Incorporated, A Corporation, Defendants Below, Petitioners,**

v.

**Arthur M. RECHT, Judge of the Circuit Court of Ohio County, and George P. Naum and Joan Naum, Plaintiffs Below, Respondents.**

No. 33383.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 12, 2007.

Decided Nov. 8, 2007.

Thomas E. Buck, April J. Wheeler, Bailey & Wyant, P.L.L.C., Wheeling, WV, for the Petitioners.

Jonathan E. Turak, Gold, Khourey & Turak, L.C., Moundsville, WV, for the Respondents, George P. Naum and Joan Naum.

PER CURIAM.

Mr. Lambert Jones, II, (hereinafter "Mr. Jones" or "the Petitioner") seeks a writ of prohibition to prevent enforcement of an order of the Circuit Court of Ohio County excluding certain medical expert testimony in the underlying personal injury action. Mr. Jones contends that the lower court erred in excluding the testimony at issue and argues that such testimony is admissible and essential to a fair trial of the underlying civil action. Subsequent to a thorough review of the briefs, record, and applicable precedent, this Court grants a moulded writ of prohibition.

### I. Factual and Procedural History

On April 30, 2003, Mr. Jones and Dr. George P. Naum were involved in a motor vehicle accident in Ohio County, West Virginia. Mr. Jones, driving a Ford Probe, rear-ended Dr. Naum's Lincoln in a school zone. Dr. Naum thereafter filed a civil action against Mr. Jones, asserting that the impact of the collision had caused physical injuries to Dr. Naum, resulting in neurological problems, such as a concussion, headaches, dizziness, confusion, and memory problems. The central issue in the underlying civil action is whether the medical conditions were caused by the subject motor vehicle accident or were the result of other accidents or unrelated medical conditions suffered by Dr. Naum.

Mr. Jones hired Dr. Peter E. Sheptak, a neurological surgeon,[1] as a defense witness,

---

1. Dr. Sheptak's qualifications are extensive, and his credentials to testify as a neurosurgeon are

intending to challenge Dr. Naum's allegation that the collision had caused the neurological conditions. Dr. Sheptak was disclosed as a defense witness on April 12, 2006, almost one year prior to the pre-trial hearing. In a letter dated January 10, 2006, Dr. Sheptak explained as follows:

Upon reviewing the police report and other history concerning the April, 2003 incident it becomes very obvious that this was an extremely low level impact with no significant discernable damage to either vehicle. Therefore I find it highly unlikely that the patient suffered a concussion during the impact. I also feel it highly unlikely that he struck his head on the roof as he reported to several physicians.

Dr. Sheptak continued his observations regarding the force of the collision's impact in his deposition testimony on March 29, 2007, as follows:

Q. ... [I]s it your opinion that the impact lacked sufficient force to have caused Dr. Naum to strike his head?

A: Yes, that's my opinion at this time, that's correct.

Q. Okay. So then you believe that that supports your conclusion ... that it's unlikely he suffered a concussion?

A: Related to the impact, that's correct.

Q: Right. So you have reached conclusions regarding the potential of this collision to have caused Dr. Naum's complaints, correct?

A: Correct.

Q: And the conclusions you've reached regarding the potential of the collision, the speed and the impact, to have caused Dr. Naum's complaints provides part of the basis for your opinions in this case?

A: Yes, that's correct.

Dr. Sheptak was also asked whether it would be his opinion "that because of the speed of the impact and the degree of damage suffered to the vehicles that it would be unlikely that he suffered such a concussion in this accident." Dr. Sheptak answered: "Yes, that's what I believe, that it would be highly unlikely."

On the evening before the scheduled April 6, 2007, pretrial hearing, Dr. Naum served a motion to exclude the testimony of Dr. Sheptak, contending that Dr. Sheptak's deposition testimony with respect to the neurological components was tainted by his conclusions regarding the change in velocity experienced by Dr. Naum inside the vehicle at the time of the accident. Dr. Naum maintains that such testimony is not admissible because Dr. Sheptak is not a biomechanical expert, that he is not qualified to render the opinions he sought to offer in this matter, and that his conclusions constitute mere speculation and conjecture.

During the hearing on the motion to exclude the testimony, the trial court initially responded by indicating that Dr. Sheptak "is not getting knocked out completely at all." In further discussion, however, the trial court observed that it was extremely difficult to "separate the various" parts of Dr. Sheptak's testimony, attempting to limit his testimony to appropriate medical conclusions without incorporating his personal opinions regarding the force of the collision. The trial court requested suggestions regarding the appropriate method of separating "that which may be related to the accident itself in terms of mechanics of it and that related just to his history, including his heart history and everything else[.]" Counsel for Mr. Jones indicated that if the court chose not to permit testimony from Dr. Sheptak regarding the "biomechanical issues—in other words, the force of the impact—then he can simply talk about everything else." Counsel explained: "His opinions of everything else stand alone and independent and separate from any biomechanical aspect. He indicated he's not a biomechanical expert." The trial court expressed the belief that "[i]t's all part of a fabric of his opinions, which include the biomechanical part of the equation, and he's not qualified to do that."

The trial court ultimately held that Dr. Sheptak's testimony would not be admitted at trial, finding that the "neurological issues ... are enmeshed ... inextricably entwined, with biomechanical aspects of which he's not qualified. And it is not possible to demar-

not challenged.

cate that part of his testimony from the neurosurgery." The petitioner now seeks a writ of prohibition to prevent the complete exclusion of Dr. Sheptak's testimony.

## II. Standards of Review

■ This Court explained the standard of review applicable to a writ of prohibition in syllabus point two of *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977), as follows: "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W.Va.Code* 53–1–1."[2] "The writ [of prohibition] lies as a matter of right whenever the inferior court (a) has not jurisdiction or (b) has jurisdiction but exceeds its legitimate powers and it matters not if the aggrieved party has some other remedy adequate or inadequate." *State ex rel. Valley Distributors, Inc. v. Oakley*, 153 W.Va. 94, 99, 168 S.E.2d 532, 535 (1969).

■ In syllabus point four of *State ex rel Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996), this Court explained as follows:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for

determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

■ With regard to the specific issue of the admissibility of expert testimony, this Court stated as follows in syllabus point six of *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700, *cert. denied*, 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991): "The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Applying those standards of review to the issue sub judice, we examine the Petitioner's request for a writ of prohibition.

## III. Discussion

Rule 702 of the West Virginia Rules of Evidence governs the admissibility of testimony by expert witnesses. That rule provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 of the West Virginia Rules of Evidence outlines the factual basis which upon which an expert may found his opinion, providing as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**2.** West Virginia Code § 53–1–1 (1923) (Repl.Vol. 2000) provides as follows:

The writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of

power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers.

█ Underlying all admission issues is the instruction of Rule 403 of the West Virginia Rules of Evidence, providing that a trial court may exclude evidence because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In syllabus point two of *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), this Court explained:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

█ With specific regard to the weight to be given to an expert opinion, this Court explained as follows in syllabus point four of *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994): "Pursuant to *West Virginia Rules of Evidence* 702 an expert's opinion is admissible if the basic methodology employed by the expert in arriving at his opinion is scientifically or technically valid and properly applied. The jury, and not the trial judge, determines the weight to be given to the expert's opinion." The Supreme Court of the United States, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469(1993), recognized the difficulties inherent in analyzing expert opinion

and observed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. 2786.

█ In the case sub judice, Dr. Naum essentially contends that Dr. Sheptak's testimony is inadmissible because it is based upon a personal opinion which Dr. Sheptak is not qualified to render. The discussion among counsel for the parties and the trial judge, referenced above, reveals the difficulty in discerning a method of separating Dr. Sheptak's neurological testimony from his opinion regarding the biomechanical components of the accident. However, such separation is absolutely essential in this case. Wholesale exclusion of Dr. Sheptak's testimony, some of which is based upon thorough and competent medical evaluation, is not warranted. In *Minner v. American Mortgage and Guaranty Co.*, 791 A.2d 826 (Del.Super.2000), the Superior Court of Delaware examined several challenges to portions of testimony of proposed expert witnesses. With measured precision, the court isolated specific portions of testimony deemed admissible at trial and excised those portions which were considered inadmissible. With regard to the projected testimony of Dr. Grace Ziem, for instance, the court explained that "some of Dr. Ziem's proposed testimony lacks the required relevance and reliability necessary to be presented to the jury as expert testimony[.]" 791 A.2d at 859. However, the court determined that the acceptable portions of Dr. Ziem's testimony should be permitted. The court held:

> In summary, the Court will allow Dr. Ziem to testify as to her diagnoses and theories of causation on RADS and TE. She will not, however, be permitted to testify as to her diagnoses of SBS and MCS because they are not valid medical diagnoses. She also will not be able to give her expert medical opinion that the Plaintiffs' FM and CFS were caused by the building because these conditions have no known etiology and Dr. Ziem has not followed a sufficient scientific methodology in her opinion of causation. Thus, Dr.

Ziem can only testify as an expert on limited diagnoses and care must also be taken not to overstate her status as a treating physician.

*Id.*

Likewise, the opinions of Dr. David W. Messinger were examined, and the admissible portions were selected.

Dr. Messinger's opinions as to the Discover Card building being the cause of the Ms. Brennan's CFS and FM, two conditions which have no known etiology, are unsupported by sound scientific theory or methodology or by the identification of specific causative agents. The Court will, however, allow Dr. Messinger to testify as to what he feels is the cause of the chronic sinusitis in the Plaintiffs, a disease which has known causes. Therefore, the Defendants' Motion in Limine as to Dr. Messinger is GRANTED in part and DENIED in part.

*Id.* at 862.

The Delaware court also examined the tendency of counsel to utilize a medical diagnosis expert as a causation expert and cautioned that the expert "should be allowed to testify as to the valid diagnoses that he made as to all three of these Plaintiffs, but his testimony should be limited to his diagnoses [He] cannot be used as a causation expert." *Id.* at 863. The court observed: "For the most part, the problem with the Plaintiffs' medical experts is that they make unsupported jumps as to causation and then ask the Court to make an unwarranted and unwise leap of faith." *Id.* at 867.

It is this issue of causative link that provides the stumbling block in the present case. Dr. Sheptak is not a biomechanical expert, and the trial court was absolutely correct to exclude testimony regarding his opinion of the biomechanical components of the underlying civil action. However, as difficult as it might be to distinguish between Dr. Sheptak's biomechanical opinions and his neurosurgery opinions, such demarcation must be accomplished. We note that Petitioner's counsel offered on the record to find a suitable accommodation and demarcation, but that offer was rejected by the trial court.

This Court recognizes that cases involving inadmissible portions of expert opinion pose a particularly challenging task to both the trial court and trial counsel. In this matter, this Court finds that the trial court erred in excluding the testimony of Dr. Sheptak in its entirety. Some modified use of the evidence must be achieved to permit the admissible portions of the testimony to be presented to the jury. This Court does not find that the entirety of Dr. Sheptak's testimony is tainted by his inadmissible perceptions regarding the biomechanics of the collision. Dr. Sheptak's testimony must be strictly restricted to medical testimony. Issues regarding the force of impact must be redirected to experts qualified in accident reconstruction or biomechanics. It is also noted that some of the difficulties may be addressed by the use of hypothetical questions grounded on evidence admissible from other witnesses possessed of the necessary expertise that Dr. Sheptak clearly lacked.

These conclusions are consistent with this Court's prior applications of the Rules of Evidence regarding admissibility of expert testimony and the liberal thrust of those rules. *See Short v. Appalachian OH–9, Inc.,* 203 W.Va. 246, 253, 507 S.E.2d 124, 131 (1998) (stating that "the essence of Rule 702 is that of assisting the fact finder's comprehension through expert testimony"); *Tanner v. Rite Aid of West Virginia, Inc.,* 194 W.Va. 643, 654 n. 17, 461 S.E.2d 149, 160 n. 17 (1995) ("Helpfulness to the jury . . . is the touchstone of Rule 702"). In *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995), this Court recognized that the Rules of Evidence are liberal and that a trial court should "en on the side of admissibility." 195 W.Va. at 525, 466 S.E.2d at 184.

Based upon the foregoing, this Court grants the writ of prohibition, as moulded by this opinion, and remands this matter to the trial court for further proceedings consistent with this opinion.

Writ granted as moulded.

Chief Justice DAVIS concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

Justice BENJAMIN concurs and reserves the right to file a concurring opinion.

DAVIS, C.J., concurring, in part, and dissenting, in part:

In this case, the majority correctly determined that Mr. Jones's expert witness, Dr. Sheptak, should have been permitted to testify and that the circuit court erred by refusing his testimony. I write separately to address two matters. First, although the majority correctly found that Dr. Sheptak should have been permitted to testify, the majority incorrectly limited his testimony to exclude any reference to "biomechanics," and from that ruling, I respectfully dissent. Insofar as Dr. Sheptak was qualified as a neurosurgeon to render expert testimony in this case, he should have been permitted to offer an opinion as to the neurological effects, if any, of the underlying accident vis-a-vis the injuries which Dr. Naum has attributed thereto. I write further to touch upon a recurrent issue arising in the circuit courts of this State: the automatic exclusion of expert witness testimony even though the expert is qualified to render such an opinion and the expert's testimony is admissible. *See San Francisco v. Wendy's Int'l, Inc.,* 221 W.Va. 734, 656 S.E.2d 485 (2007) (Davis, C.J., concurring) (commenting on exclusion of testimony of expert witnesses). *Cf. Walker v. Sharma,* 221 W.Va. 559, 655 S.E.2d 775 (2007) (Davis, C.J., concurring) (emphasizing that once trial court has found expert qualified to testify, determination of weight to be afforded to expert's testimony rests within province of fact finder). Given the pervasiveness of this problem, a clarification of the circuit courts' " 'gatekeeper' role," Syl. pt. 4, in part, *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995), is in order.

Rule 702 of the West Virginia Rules of Evidence authorizes testimony by expert witnesses. Specifically, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Id. See also* W. Va. R. Evid. 703 (explaining "[b]ases of opinion testimony by experts"); W. Va. R. Evid. 705 (discussing "[d]isclosure of facts or data underlying expert opinion"); W. Va. R. Evid. 706 (permitting "[c]ourt appointed experts"). It is apparent, then, that Rule 702 requires a trial court to make three threshold determinations: (1) whether "scientific ... knowledge"[1] would be instructive to rendering a decision in the case, (2) whether the proffered witness is qualified to render an opinion as an expert witness, and (3) whether the expert witness's testimony is admissible.

First, the trial court must ascertain whether "scientific knowledge" would assist the trier of fact in rendering a decision in the case. With respect to this first inquiry, we have explained the term "scientific knowledge," as used in Rule 702, in the following manner:

"Scientific" implies a grounding in the methods and procedures of science while "knowledge" connotes more than subjective belief or unsupported speculation. In order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. It is the circuit court's responsibility initially to determine whether the expert's proposed testimony amounts to "scientific knowledge" and, in doing so, to analyze not what the experts say, but what basis they have for saying it.

Syl. pt. 6, in part, *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171. Moreover,

[i]n determining whether the testimony will assist the trier of fact, a circuit court is required to make a common sense inquiry into "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those in the case *sub judice. See generally* Robin Jean Davis, *Admitting Expert Testimony in Federal Courts and its Impact on West Virginia Jurisprudence,* 104 W.Va. L.Rev. 485 (2002) (arguing that no distinction should be made between "scientific" and "technical" evidence).

---

1. Although the Court recognizes a distinction between "scientific" and non-scientific "technical" evidence permitted under Rule 702 and the corresponding analysis to determine such evidence's admissibility, this separate opinion will focus solely upon "scientific" evidence insofar as that is the type of expert testimony that is at issue

having a specialized understanding of the subject involved in [the] dispute."

*Gentry*, 195 W.Va. at 528, 466 S.E.2d at 187 (quoting Mason Ladd, *Expert Testimony*, 5 Vand. L.Rev. 414, 418 (1952)).

The second inquiry requires the trial court to determine whether the proffered witness is qualified as an expert. To assist trial courts in determining whether a witness should be qualified as an expert, we have adopted a list of factors that should be considered when conducting a Rule 702 analysis:

> In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

Syl. pt. 5, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171. *Accord Cargill v. Balloon Works, Inc.*, 185 W.Va. 142, 146, 405 S.E.2d 642, 646 (1991) (per curiam) (observing that an "expert witness [may be] qualified by knowledge, skill, experience, training, *or* education" (emphasis added)). *See also Gentry*, 195 W.Va. at 525 n. 18, 466 S.E.2d at 184 n. 18 ("Neither a degree nor a title is essential, and a person with knowledge or skill borne of practical experience may qualify as an expert[.]").

Third, and finally, after the trial court has determined that the evidence at issue constitutes "scientific knowledge" and that the proffered witness is qualified to testify as an expert, the trial court must decide whether such evidence is admissible. Syl. pt. 6, in part, *Gentry*, 195 W.Va. 512, 466 S.E.2d 171 ("The question of admissibility . . . only arises if it is first established that the testimony deals with 'scientific knowledge.'" (citations omitted)). The initial inquiry regarding admissibility is whether the proffered testimony is both reliable and relevant:

> The first and universal requirement for the admissibility of scientific evidence is that the evidence must be both "reliable"

and "relevant." Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), the reliability requirement is met only by a finding by the trial court under Rule 104(a) of the West Virginia Rules of Evidence that the *scientific* or technical theory which is the basis for the test results is indeed "scientific, technical, or specialized knowledge." The trial court's determination regarding whether the scientific evidence is properly the subject of scientific, technical, or other specialized knowledge is a question of law that we review *de novo*. On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue." W. Va. R. Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement is under an abuse of discretion standard. *State v. Beard*, 194 W.Va. 740, 746, 461 S.E.2d 486, 492 (1995).

Syl. pt. 3, *Gentry*, 195 W.Va. 512, 466 S.E.2d 171. *See also* Syl. pt. 4, *Gentry*, 195 W.Va. 512, 466 S.E.2d 171 ("When scientific evidence is proffered, a circuit court in its 'gatekeeper' role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied*, [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand."). *Cf.* Syl. pt. 4, *San Francisco v. Wendy's Int'l, Inc.*, 221 W.Va. 734, 656 S.E.2d 485 (2007) ("Because the summary judgment process does not conform well to the discipline and analysis that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993) and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993) impose, the *Daubert/Wilt* regime should be employed only with great care and circumspection at the summary judgment stage. Courts must be cautious—except when defects are obvious on the face of a proffered expert opinion—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility. Given the plain language of the *West Virginia Rules of Evidence*, the side trying to defend the admission of expert evidence must be given an adequate chance to do so.").

Additionally, the trial court also must assess the particular scientific evidence offered by the expert witness, particularly the basis upon which the expert has relied in formulating his/her opinion:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

Syl. pt. 2, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993). *Cf.* Syl. pt. 1, *Wilt*, 191 W.Va. 39, 443 S.E.2d 196 ("Under Rule 702 of the West Virginia Rules of Evidence, there is a category of expert testimony based on scientific methodology that is so longstanding and generally recognized that it may be judicially noticed and, a trial court need not ascertain the basis for its reliability.").

Once a trial court has found that a witness is qualified to testify as an expert and that his/her testimony is reliable, the opposing party may discredit the expert's testimony through cross-examination or contradictory evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Gentry*, 195 W.Va. at 525–26, 466 S.E.2d at 184–85 (same). *See also Watson v. Inco Alloys Int'l, Inc.*, 209 W.Va. 234, 243–44, 545 S.E.2d 294, 303–04 (2001) ("'"Once a witness is permitted to testify, it is within the province of the jury to evaluate the testimony, credentials, background, and qualifications of the witness to address the particular issue in question. The jury may then assign the testimony such weight and value as the jury may determine."'" (quoting *West Virginia Div. of Highways v. Butler*, 205 W.Va. 146, 152, 516 S.E.2d 769, 775 (1999) (quoting *Cargill v. Balloon Works, Inc.*, 185 W.Va. at 147, 405 S.E.2d at 647))). *Cf.* Syl. pt. 3, *Walker v. Sharma*, 221 W.Va. 559, 655 S.E.2d 775 (2007) ("Following a trial court's decision that a physician is qualified to offer expert testimony in a given field, issues that arise as to the physician's personal use of a specific technique or procedure to which he or she seeks to offer expert testimony go only to the weight to be attached to that testimony and not to its admissibility."). The fact finder then may determine whether or not the expert is credible. This credibility determination is one to be made by the finder of fact, not by the trial court. *See* Syl. pt. 4, in part, *Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87 (1994) ("The jury, and not the trial judge, determines the weight to be given to the expert's opinion.").

The foregoing analysis sets forth the detailed inquiry trial courts are required to conduct when a party offers scientific evidence through the testimony of an expert witness. Trial courts should not exclude testimony by an expert until they have considered the nature of the evidence and the expert's qualifications in accordance with

these factors; credibility determinations rest with the fact finder, not the trial court. Wholesale exclusion of expert testimony is appropriate *only* when such evidence is determined to be "junk science." *See Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1321 n. 18 (9th Cir.1995) (observing that "the two prongs of Rule 702 work in tandem to ensure that junk science is kept out of the ... courtroom"); *Gentry,* 195 W.Va. at 526, 466 S.E.2d at 185 (same). Otherwise, expert testimony is presumptively admissible unless application of the three threshold factors requires a contrary conclusion. "Rule 702 adopts a liberal stance on admitting expert testimony and favors admissibility[.]" *Wilt,* 191 W.Va. at 53, 443 S.E.2d at 210 (Neely, J., concurring). In other words, "there is no 'best expert' rule. Because of the 'liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility." *Gentry,* 195 W.Va. at 525, 466 S.E.2d at 184 (citation omitted). *See also McDougal v. McCammon,* 193 W.Va. 229, 236, 455 S.E.2d 788, 795 (1995) ("Under Rule 401 [of the West Virginia Rules of Evidence], evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility.").

Despite our prior holdings instructing trial courts on the procedure to follow to determine the admissibility of expert testimony, the trial court in this case did not conduct such an analysis but rather prohibited the expert from testifying *in toto.* Applying the foregoing standards to the case *sub judice,* it is apparent that the first prong of the above-described analysis has been met insofar as the evidence Mr. Jones sought to introduce through his expert, Dr. Sheptak, is both scientific in nature and would assist the trier of fact in rendering a determination of the case. Through Dr. Sheptak, a neurosurgeon, Mr. Jones sought to establish the extent to which the injuries that Dr. Naum contended had resulted from his accident with Mr. Jones were likely attributable thereto. Thus, this evidence goes directly to the issue of causation.

Moreover, the parties do not dispute that, pursuant to the second inquiry, Dr. Sheptak is qualified to testify as an expert witness in this case. The only dispute that the parties had as to Dr. Sheptak's qualifications concerned the subject matter about which he was qualified to testify. Under the third factor regarding the admissibility of the expert's testimony, the majority delineated between those matters about which Dr. Sheptak would be permitted to testify, *i.e.,* neurological findings and conclusions, and those matters about which he would not be permitted to testify, *i.e.,* opinions as to the "biomechanics" of the underlying accident and the effects thereof. I disagree with this demarcation. Rather, as a neurosurgeon qualified to render an opinion in this case about Dr. Naum's neurological injuries, if any, resulting from his underlying accident with Mr. Jones, Dr. Sheptak should have been permitted to testify as to whether, in his expert opinion, the injuries that Dr. Naum attributed to said accident were, in Dr. Sheptak's opinion, actually caused by that accident or whether Dr. Naum's ailments were the result of another cause or causes.

In summary, because the majority properly considered the nature of the evidence and the expert's qualifications to determine that Dr. Sheptak should be permitted to testify, I concur in the majority's decision to grant as moulded the requested writ of prohibition. However, I respectfully dissent from that portion of the majority's opinion prohibiting Dr. Sheptak from testifying as to matters deemed by the majority to constitute "biomechanics."

BENJAMIN, Justice, concurring:

I write separately to make clear that, *so long as an adequate foundation is established for his opinion,* Dr. Peter E. Shepek (hereinafter "Dr. Shepek") may testify as a qualified neurological expert regarding his opinion as to whether the automobile collision at issue in the underlying litigation might cause the kind of neurological injuries claimed by George P. Naum.[1] I therefore

---

1. Dr. Sheptak's proposed testimony, however, went further. In his correspondence and deposi-

tion testimony, Dr. Sheptak stated that from his reading of the accident report and "other histo-

agree with the majority opinion that the trial court erred and that Dr. Sheptak's testimony may not be excluded in its entirety, at least to the extent his testimony is restricted to medical issues. I must disagree, however, with my colleague, Chief Justice Davis, in her partial dissent to the extent that she would permit Dr. Sheptak to testify regarding "the 'biomechanics' of the underlying accident and the effects thereof." Davis, concurring, in part, and dissenting, in part, p. 10.

Under Rule 702 of the *West Virginia Rules of Evidence*, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Additionally, Rule 703 of the *West Virginia Rules of Evidence* provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Moreover, this Court has previously held that "[a]ny physician qualified as an expert may give an opinion about the physical and medical cause of injury[.]" Syl. Pt. 5, in part, *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982); Syl. Pt. 3, in part, *State v. McKenzie*, 197 W.Va. 429, 475 S.E.2d 521 (1996)(*per curiam*)(same).

Undoubtedly, Dr. Shepek is familiar with the types of neurological injuries which can be expected to be sustained in various types of collisions by virtue of his knowledge, skill, experience and training. As such, if the proper foundation were established, it would be perfectly acceptable for him to provide his opinion on whether it is possible for a neurological injury such as that claimed by Dr.

Naum to be sustained in a collision having characteristics similar to the collision at issue herein. For example, once evidence has been introduced regarding the speed and impact of the collision, a series of hypothetical questions could properly be posed to Dr. Shepek inquiring based upon his experience as to the type of neurological injury he would expect to see under such conditions, whether he believes the neurological injury claimed by Dr. Naum is possible under such conditions and/or whether something else is more likely to have caused the neurological injury claimed. What Dr. Shepek may properly be prohibited from testifying about, however, is the actual "biomechanics" of the accident itself; *i.e.,* whether the mechanics of the accident were sufficient to create some level of force and whether that force would cause an occupant to strike his head on the roof of the car. Dr. Shepek is qualified to render an opinion regarding Dr. Naum's alleged neurological injury. He has not been qualified to render an opinion on biomechanics.

---

ry," the accident had caused no discernible damage to either vehicle, had an extremely low level impact, and lacked sufficient force to make it highly unlikely that the accident had caused Naum to strike his head on the roof of his automobile and to suffer a concussion. In its order excluding Dr. Sheptak's testimony, the trial court held that because "the neurological issues ... are enmeshed ... inextricably entwined, with biomechanical aspects of which he's not qualified. And it is not possible to demarcate that part of his testimony from the neurosurgery."