**FILED**

**April 26, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

William Caudill,
duly appointed guardian of
minor infants T.M. and C.M.;
Charles Samuel Hammett;
Kimberly Dawn Hammett; and
Haylie Hammett,
Plaintiffs below, Petitioners

**vs.) No. 21-0096** (Raleigh County 16-C-13, 16-C-14)

EAN Holdings LLC, d/b/a Enterprise
Rent-A-Car; Buenaventura Jesurum;
Empire Fire and Marine Insurance
Company; Rental Insurance Services, Inc., and
Rafael Lorenzo Herrera,
Defendants below, Respondents.

**MEMORANDUM DECISION**

On March 22, 2015, Rafael Herrera drove a rented Ford Explorer north in the southbound lane of I-77 in Raleigh County. The Explorer collided into a Ford Escape driven by Lisa McCormick, who died in the collision. Her children, C.M. and T.M., and their friend, Haylie Hammett, were seriously injured in the collision. Mr. Herrera suffered only minor injuries.

William Caudill, guardian of T.M. and C.M.,[1] and Haylie Hammett, Charles Samuel Hammett, and Kimberly Dawn Hammett (the Hammetts)[2] filed suit against Mr. Herrera[3] in the Circuit Court of Raleigh County in 2016. They also named as defendants EAN Holdings LLC,

---

[1] Mr. Caudill is represented by Scott S. Segal, Esq., C. Edward Amos, II, Esq., and Jason P. Foster, Esq.

[2] The Hammetts are represented by Edward Gibson White, II, Esq., Edward G. White, III, Esq., and Charles M. Love, IV, Esq.

[3] Mr. Herrera is not a party to this appeal.

d/b/a Enterprise Rent-a-Car (EAN),[4] Buenaventura Jesurum,[5] Rental Insurance Services Inc. (RIS),[6] and Empire Fire and Marine Insurance Company (Empire).[7] In a series of orders entered in 2020, the circuit court granted summary judgment to EAN, Mr. Jesurum, RIS, and Empire on Petitioners' claims. Petitioners now appeal those orders.

Upon consideration of the standard of review, the briefs, the record presented, and the parties' oral arguments, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's orders is appropriate under Rule 21 of the Rules of Appellate Procedure.

## I. FACTUAL BACKGROUND

On or around March 11, 2015, Mr. Herrera tried to rent a vehicle from EAN at its Cleveland, Tennessee branch (EAN Tennessee). He was accompanied by Mr. Jesurum, whom he had known for only a few days. Mr. Herrera showed EAN employees his valid, Florida driver's license (which identified Mr. Herrera as a "safe driver"), but he had neither a credit card nor proof that he lived near Cleveland, so EAN would not rent a vehicle to him. The men returned to EAN Tennessee on March 13. This time, Mr. Jesurum asked to rent a car with Mr. Herrera as a second driver. Mr. Jesurum showed staff at EAN Tennessee his driver's license, proof of address, and gave them his debit card. After signing the necessary paperwork, EAN Tennessee rented a Chrysler Town & Country van to Mr. Jesurum.

The rental agreement between EAN and Mr. Jesurum did not specify that anyone other than Mr. Jesurum was permitted to drive the Town & Country. The box on the rental agreement regarding the states in which the rented van could be operated was also left blank. Further, under EAN Tennessee Rental Guidelines, authorized additional drivers had to meet the same qualifications as the named renter. So, Mr. Herrera—who did not qualify to rent a vehicle from EAN due to lack of credit and proof of permanent address—did not qualify as an authorized driver of Mr. Jesurum's rental vehicle.

According to Mr. Jesurum, he gave the Town & Country to Mr. Herrera on March 13 or early the next morning so the latter could drive another man to a job opportunity out of state. Mr. Herrera later stated that he had been given the van with instructions to drive to Mesa, Arizona and pick up six people from a Wal-Mart parking lot.[8] Mr. Herrera stated that he had been paid to make

---

[4] EAN is represented by A.L. Emch, Esq., Sarah A. Phipps, Esq., Bettina J. Strauss, Esq., and Stefani L. Wittenaur, Esq.

[5] Mr. Jesurum is represented by Charles K. Gould, Esq., Charlotte H. Norris, Esq., and Michael A. Frye, Esq.

[6] RIS is represented by Philip J. Combs, Esq. and Caleb A. Ellis, Esq.

[7] Empire is represented by Edgar A. Poe, Jr., Esq. and Kevin J. Robinson, Esq.

[8] Petitioners assert that Mr. Jesurum and Mr. Herrera were engaged in human trafficking. As noted below, Mr. Herrera has a criminal history; however, the record does not reflect that either

the trip and intimated that the six people were in this country illegally. By March 21, Mr. Herrera had made one out-and-back trip to Arizona.[9]

Around noon on March 21, 2015, Mr. Herrera arrived at an EAN branch in Corbin, Kentucky (EAN Kentucky). The Town & Country had been driven approximately 7,700 miles since Mr. Jesurum had rented it on March 13. Mr. Herrera told Brent Bradshaw, branch manager, that the Town & Country had a bad transmission, and that he wanted another vehicle. Mr. Herrera provided Mr. Bradshaw with a copy of the rental agreement. Mr. Bradshaw checked EAN's internal computer system and saw that Mr. Herrera was listed there as an additional driver of Mr. Jesurum's rental vehicle. He viewed Mr. Herrera's Florida driver's license and saw that it was unexpired. Mr. Bradshaw would later attest that during their interaction, Mr. Herrera did not appear impaired, intoxicated, or otherwise unfit to drive. Mr. Herrera has also attested that while present at EAN Kentucky, he gave EAN personnel no reason to believe that he was under the influence of drugs or alcohol, no information about his driving history or possible involvement in criminal activity, and no information that would have suggested that he was not capable of driving a rental vehicle. Mr. Bradshaw accepted the Town & Country, provided a Ford Explorer to Mr. Herrera, and then watched him drive out of the parking lot.

Mr. Herrera spent the night of March 21 in a hotel in Tennessee. He later stated that he spent the night with a teenage girl and ingested cocaine, so that he "rested but he didn't sleep." Mr. Herrera also stated that he had contact with a man (presumably Mr. Jesurum) and that he informed Mr. Jesurum that he was tired. According to Mr. Herrera, Mr. Jesurum told him to continue to drive.

Roughly twenty-four hours after picking up the Explorer from EAN Kentucky, Mr. Herrera drove that vehicle northward in the southbound lane of Interstate 77, near Beckley, West Virginia. Ms. McCormick drove her Ford Escape southward in the southbound lane. The vehicles collided. Ms. McCormick was killed, and T.M., C.M., and H.H. were seriously injured. Mr. Herrera suffered minor injuries. Mr. Herrera was indicted for murder, one count of driving under the influence causing death, and three counts of driving under the influence causing injury. He later pled no contest to voluntary manslaughter.[10]

---

Mr. Herrera or Mr. Jesurum has ever been convicted of or charged with a crime related to human trafficking.

[9] Petitioners assert in their brief that by March 21, 2015, Mr. Jesurum had completed "one run and was . . . finishing a second." In the transcript of his March 23, 2015 interview with authorities, Mr. Jesurum states that he had completed *one trip* to Mesa and "was going to do another now but now I can't, my grandma is going to do it. I would have done more, you know."

[10] Petitioners included in their response to EAN's renewed motion for summary judgment documents related to Mr. Herrera's criminal record. Those documents show that an information was filed on July 16, 2010 in Berks County, Pennsylvania against Mr. Herrera, alleging crimes related to domestic abuse: terroristic threats, simple assault, and harassment. He plead no contest to Count 1 (terroristic threats), and the other counts were dismissed. He was sentenced to serve

Mr. Jesurum had accepted supplemental liability insurance protection (SLP) offered through EAN when he rented the Town & Country on March 13. Empire was the SLP insurer and RIS investigated the collision. On March 30, 2015, a claims supervisor with Zurich, third-party administrator to Empire, wrote to Mr. Jesurum and Mr. Herrera and denied and disclaimed coverage under the SLP because Mr. Herrera had not been listed on the rental agreement as an authorized driver of the EAN rental vehicle. On April 6, 2015, Mr. Jesurum and Mr. Herrera were notified by the Zurich claims supervisor that the March 30, 2015 disclaimer of coverage was rescinded but that Empire was reserving its rights under the policy due to questions regarding Mr. Herrera's status as an additional, authorized driver on the rental agreement and the possibility that he was under the influence of alcohol or drugs at the time of the collision. On February 15, 2016, the Zurich claims supervisor notified Mr. Jesurum and Mr. Herrera that the April 6, 2015, reservation of rights was being revised, and that the remaining coverage question was whether Mr. Herrera had been under the influence of alcohol or drugs at the time of the collision. On June 5, 2017, the Zurich claims supervisor notified Mr. Jesurum and Mr. Herrera that the investigation of the claim was concluded and that the reservation of rights had been rescinded. Coverage-limits offers have been made to Mr. Caudill, guardian of T.M., C.M., and the Hammetts.

Petitioners filed their complaint in January 2016 and amended it in June 2017. The amended complaint includes the following claims: I. Negligence of Mr. Herrera; II. Negligence Per Se of Mr. Herrera; III. Negligent Entrustment of EAN; IV. Negligence of Ms. McCormick; V. Negligence Per Se of Ms. McCormick; VI. Negligent Entrustment of Brent Monroe (owner of the Ford Escape); VII. Negligent Entrustment of Mr. Jesurum; VIII. Declaratory Judgment; IX. Direct Negligence, Vicarious Liability, and Joint and Several Liability of EAN; and X. Intentional Infliction of Emotional Distress (IIED), Civil Conspiracy and Collusion Between EAN, RIS, and Empire.

EAN moved for summary judgment of Petitioners' claims for negligent entrustment, negligence, and IIED/conspiracy in September 2018.[11] RIS and Empire moved for summary judgment of Petitioners' IIED/conspiracy claim in October 2019, and Mr. Jesurum moved for summary judgment of the negligent entrustment claim that month, as well. The court granted RIS, Empire, and Mr. Jesurum's motions in February and March 2020. Petitioners later moved the

---

up to twenty-three months in the Berks County jail; however, the same day he was placed on one year of probation. It appears that in April 2011, Mr. Herrera committed a technical violation of the requirements of his probation and a bench warrant was issued by the Court of Common Pleas, Berks County for Mr. Herrera's arrest if he was found in Pennsylvania. Petitioners include in the appendix news reports stating that Mr. Herrera was on probation in Florida and wanted for making terroristic threats in Pennsylvania at the time of the collision.

[11] EAN styled the September 2018 motion a "renewed" motion for summary judgment. It filed its initial motion for summary judgment in May 2017, before Petitioners amended their complaint.

court to reconsider those orders, and the court denied those motions in June 2020. Then, the court granted EAN's motion for summary judgment in December 2020.[12] This appeal followed.

## II. STANDARD OF REVIEW

"A circuit court's entry of summary judgment is reviewed *de novo*,"[13] "and, therefore, we apply the same standard as a circuit court."[14] "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."[15]

> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.[16]

## III. ANALYSIS

Petitioners assign twenty-six errors to the circuit court's orders granting summary judgment to EAN,[17] RIS, Empire, and Mr. Jesurum. We organize these assignments of error into four general categories: the circuit court erroneously (1) deprived Petitioners of due process by prematurely deciding RIS, Empire, and Mr. Jesurum's motions for summary judgment, (2) applied Kentucky and Tennessee law to their negligence-based claims against EAN and Mr. Jesurum, (3)

---

[12] On February 11, 2021, the circuit court entered an order clarifying and amending its earlier orders granting summary judgment to EAN, RIS, Empire, and Mr. Jesurum to reflect that the crossclaims of Freddie Roach (executor of Ms. McCormick's West Virginia estate) remain pending against those defendants.

[13] Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

[14] *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 58, 459 S.E.2d 329, 335 (1995).

[15] Syl. Pt. 2, *id*.

[16] Syl. Pt. 3, *id*.

[17] Petitioners also assert that the circuit court erroneously adjudged EAN's renewed motion for summary judgment by the standard set forth in West Virginia Rule of Civil Procedure 12(b)(6) rather than the summary judgment standard in Rule 56(c). Petitioners are not entitled to relief on this assignment of error. The order granting summary judgment to EAN recites the appropriate, Rule 56(c) standard and includes numerous findings regarding Petitioners' failures to show the disputed issues of fact necessary to withstand EAN's renewed motion for summary judgment.

granted summary judgment to EAN and Mr. Jesurum on Petitioners' negligence-based claims, and (4) granted summary judgment to EAN, RIS, and Empire on their claims for IIED and conspiracy.

Petitioners' arguments are addressed in that order.

## A.    PETITIONERS WERE NOT DENIED DUE PROCESS

Petitioners allege the circuit court denied them notice and a hearing when it granted Empire, RIS, and Mr. Jesurum's motions for summary judgment in February and March 2020, when those motions had been filed at the end of October 2019 and before Petitioners had responded. We briefly review relevant portions of the case's procedural history before analyzing Petitioners' arguments.

The circuit court conducted a hearing/status conference on September 3, 2019. In the post-hearing order entered on September 25, 2019, the court directed that any dispositive motions and memoranda of law be filed within thirty days of receiving the transcript of Mr. Bradshaw's deposition. EMPIRE, RIS, and Mr. Jesurum filed motions for summary judgment in late October 2019, within the timeframe established by the September 25 order and nearly four years after Petitioners' initial complaint was filed and two years and four months after Petitioners had filed their amended complaint.[18]

The parties convened for a status hearing on November 5, 2019. There, the court advised the parties of its intent to rule on the pending motions for summary judgment. The court stated that "it's time for me to make a decision with regard to either telling the defendants they're wrong on their position and they need to prepare to go forward, or telling the plaintiffs, I believe the defendants are right, and you need to adapt, if you can." The court further stated that "it would be my goal to try to have you a decision – and I hate saying this on the record – by the first of December [2019], for sure, as to what I'm going to do on the motions." As the hearing concluded, the court stated that if "someone has something that they have failed to submit, documentation-wise, I will give you an additional week from today to submit any documentation to support what you have, not new arguments and not new briefs, but evidentiary evidence that you feel you may need to supplement your records." Petitioners did not object to the court's decision during the hearing, file any additional documentation in the week following the hearing, or move the court to reconsider its decision to close briefing on the pending motions for summary judgment.

On February 12, 2020, the court entered an order granting summary judgment to RIS and Empire—roughly three months after the November 5, 2019, hearing. Petitioners moved the court to reconsider the order on March 4, 2020. Petitioners responded on May 8, 2020 to Mr. Jesurum's motion for summary judgment; however, the court had granted that motion on March 11, 2020. Petitioners represent that their response was filed in May because they did not receive notice of the court's March 11 order.[19] On May 11, 2020, Petitioners moved the court to reconsider the

---

[18] EAN's renewed motion for summary judgment was fully briefed by this time.

[19] The online register of actions (e-docket) provided to the Court shows that the order was entered on March 11, 2020 (e-docket number 1132). West Virginia Trial Court Rule 15.05(d)

March 11 order granting summary judgment to Mr. Jesurum. The court denied Petitioners' motions for reconsideration on June 30, 2020.

On appeal, Petitioners contend that the circuit court violated their procedural due process rights under the federal and state constitutions by failing to observe the timeframes set out in West Virginia Rule of Civil Procedure 6(d). Petitioners acknowledge that downward departures from the timeframes in Rule 6(d) are permissible,[20] but contend that these circumstances cannot fit that exception.

Petitioners are not entitled to relief on this assignment of error. Petitioners' motions to reconsider the judgment orders were filed more than ten days after entry of the orders, and so are in the nature of those filed under West Virginia Rule of Civil Procedure 60(b).[21] Under Rule 60(b), "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for . . . surprise . . . or any other reason justifying relief from the operation of the judgment." "'A motion to vacate a judgment made pursuant to Rule 60(b), W.Va. R.C.P., is addressed to the sound discretion of the court and the court's ruling on such motion will not be disturbed on appeal unless there is a showing of an abuse of such discretion.' Syl. pt. 5, *Toler v. Shelton*, 157 W.Va. 778, 204 S.E.2d 85 (1974)."[22]

Petitioners have not shown that the circuit court abused its discretion when it denied their motions to reconsider the orders granting summary judgment. Petitioners' arguments regarding Rule 6(d) are misplaced because under Rule 22.03 of the Trial Court Rules, a court has "discretion in determining whether a motion is decided on the record or after a hearing."[23] So, the operative question in this case is whether the circuit court violated Petitioners' procedural due process rights

provides that "[e]-filed orders maintained as part of the online register of actions *shall* satisfy the requirements of Rule 77(d) of the Rules of Civil Procedure," (emphasis added) which "obligates court clerks to immediately notify litigants of the entry of an order or judgment." Robin J. Davis and Louis J. Palmer, Jr., LITIGATION HANDBOOK ON W. VA. R. CIV. PRO. 1515 (5th ed. 2017).

[20] *See* Syl. Pt, in part, *Cremeans v. Goad*, 158 W. Va. 192, 210 S.E.2d 169 (1974) (stating that "the language of Rule 6(d) of the Rules of Civil Procedure clearly permits a reduction of the time requirements for notice of hearing").

[21] *See* Syl. Pt. 2, *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd*., 196 W. Va. 692, 474 S.E.2d 872 (1996) ("When a party filing a motion for reconsideration does not indicate under which West Virginia Rule of Civil Procedure it is filing the motion, the motion will be considered to be either a Rule 59(e) motion to alter or amend a judgment or a Rule 60(b) motion for relief from a judgment order. If the motion is filed within ten days of the circuit court's entry of judgment, the motion is treated as a motion to alter or amend under Rule 59(e). If the motion is filed outside the ten-day limit, it can only be addressed under Rule 60(b).").

[22] Syl. Pt. 1, *Fernandez v. Fernandez*, 218 W. Va. 340, 624 S.E.2d 777 (2005).

[23] *Corp. of Harpers Ferry v. Taylor*, 227 W. Va. 501, 506 n.5, 711 S.E.2d 571, 576 n.5 (2011) (citing W. Va. Trial Ct. R. 22.03 (stating that "[t]he court *may* require or permit hearings on motions[.]" (emphasis added)).

7

when it ruled on the summary judgment motions of RIS, Empire, and Mr. Jesurum before Petitioners responded, and not whether the timeframes in Rule 6(d) were observed.

"The due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard."[24]   In the September 25, 2019 order, the circuit court announced that dispositive motions would be due within thirty days after the receipt of Mr. Bradshaw's deposition transcript.  RIS, Empire, and Mr. Jesurum filed their dispositive motions within the timeframe set in that order.  Then, during the November 5, 2019 hearing, the circuit court gave several clear indications of its intent to rule on pending motions for summary judgment.  At the conclusion of that hearing, the court informed the parties that it would accept additional evidence, but not additional briefing.  Petitioners, therefore, left the hearing with the knowledge that a ruling on RIS, Empire, and Mr. Jesurum's motions was imminent and that, without further action on their part, the ruling would issue on the briefing then before the court.

Petitioners now argue that they were unfairly surprised by the court's entry of orders granting summary judgment to RIS, Empire, and Mr. Jesurum.  Yet, Petitioners took no steps to protect their interests.  They failed to alert the court regarding the status of the briefing on those motions for summary judgment—either at the November 5, 2019, hearing or later.  And even after receiving the order granting summary judgment to RIS and Empire on February 12, 2020, it appears that Petitioners neither sought clarification from the court as to briefing on Mr. Jesurum's motion nor monitored the e-docket.  In addition, the court granted RIS, Empire, and Mr. Jesurum's motions for summary judgment no less than three months after the November 5, 2019, hearing, well after the December 2019 timeframe discussed by the court.  In short, Petitioners were on notice of the court's intention to rule on the summary judgment motions of RIS, Empire, and Mr. Jesurum but failed to act to protect their interests.  On the facts before the Court, we conclude that the circuit court did not exceed its discretion by denying Petitioners' Rule 60(b) motions for relief from the orders granting summary judgment to RIS, Empire, and Mr. Jesurum.  We now consider Petitioners' substantive assignments of error.

## B.    NEGLIGENCE-BASED CLAIMS

Petitioners challenge the circuit court's orders granting summary judgment to EAN and Mr. Jesurum on their claims of negligent entrustment and direct negligence.  Before the substance of those arguments can be addressed, we consider Petitioners' assertion that West Virginia law— and not that of Kentucky and Tennessee—applies to those negligence-based claims.

### 1.    CHOICE OF LAW

The circuit court granted EAN's motion for summary judgment of Petitioners' negligent entrustment and direct negligence claims under Kentucky law—the location of the entrustment of the Explorer by Mr. Bradshaw to Mr. Herrera.  Similarly, the court granted Mr. Jesurum's motion for summary judgment of Petitioners' negligent entrustment claim under Tennessee law—the location of the entrustment of the Town & Country—and Kentucky law.  In both instances, the

---

[24] Syl. Pt. 2, *Simpson v. Stanton*, 119 W. Va. 235, 193 S.E. 64 (1937).

court reasoned that West Virginia had only one connection to Petitioners' claims (the collision occurred here), while the actual entrustments occurred in Tennessee and Kentucky. Referencing the principle of lex loci delicti—the law of the place of the alleged negligence—the court concluded that the laws of the states in which the entrustments had occurred were to be applied.

Petitioners now argue that the court misapplied lex loci delicti, and that West Virginia law applies to their negligence-based claims against EAN and Mr. Jesurum because their injuries occurred in West Virginia. EAN and Mr. Jesurum respond that the court correctly concluded that lex loci delicti is not an ironclad rule and that its application of Kentucky and Tennessee law was appropriate when the entrustments occurred in those states.

We concur with Petitioners that West Virginia law applies to their negligence-based claims against EAN and Mr. Jesurum. "In tort cases, West Virginia courts apply the traditional choice-of-law rule, *lex loci delicti*; that is, the substantive rights between the parties are determined by the law of the place of injury."[25] Petitioners plainly incurred their injuries in West Virginia; so, under the general rule of lex loci delicti, West Virginia law applies to Petitioners' negligence-based claims.[26]

EAN and Mr. Jesurum assert that West Virginia has not applied lex loci delicti in cases where the tortious conduct in question is not connected to West Virginia. They cite two cases for support, but neither is relevant to the facts of this case. For example, in *Oakes v. Oxygen Therapy Services*, the petitioner-employee appealed the grant of summary judgment to the respondent-employer.[27] The petitioner claimed that the respondent had terminated his employment in retaliation for claiming worker's compensation benefits.[28] West Virginia law recognized that civil claim, but Maryland (where he had obtained benefits) did not.[29] This Court applied the significant relationship test and affirmed the circuit court's application of Maryland law to the retaliatory discharge claim because the petitioner had been employed at the respondent's Maryland office, his employment contract stipulated that the employment relationship would be governed by Maryland

---

[25] *Vest v. St. Albans Psychiatric Hosp., Inc.*, 182 W. Va. 228, 229, 387 S.E.2d 282, 283 (1989); *see also Kenney v. Indep. Ord. of Foresters*, 744 F.3d 901, 908 (4th Cir. 2014) (observing that "[a]lthough conduct that causes harm can occur in one state and the resulting injury to a plaintiff can occur in another state, 'the substantive rights between the parties are determined by the law of the place of injury'") (quoting *West Virginia ex rel. Chemtall Inc. v. Madden*, 216 W. Va. 443, 607 S.E.2d 772, 779–80 (2004)).

[26] *See, e.g., id.* (substantive law of Virginia applied to medical malpractice claim filed in West Virginia court). Exceptions exist. *See Paul*, 177 W. Va. at 433, 352 S.E.2d at 556 (recognizing public policy exception to *lex loci delicti*).

[27] *Oakes v. Oxygen Therapy Servs.*, 178 W. Va. 543, 544, 363 S.E.2d 130, 131 (1987).

[28] *Id*.

[29] *Id*.

9

law, and he had received benefits in Maryland.[30]  *Oakes* explicitly distinguished the complex circumstances of that case from the "clear-cut cases of physical injury" to which the lex loci delicti rule has generally been applied.[31]  Here, Petitioners were injured in West Virginia; while the entrustments occurred in other states, EAN and Mr. Jesurum have not offered a compelling argument why the traditional choice of law rule should not apply to Petitioners' negligence-based claims.  For those reasons, we conclude that the circuit court erred when it applied Kentucky and Tennessee law to Petitioners' negligence-based claims.[32]

## 2.    NEGLIGENT ENTRUSTMENT BY EAN

Again, our review is *de novo*, so we apply the same standard as the circuit court:  that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."[33]  Petitioners assign fourteen errors to the circuit court' s grant of summary judgment to EAN on their claims of negligent entrustment and negligence and five to the grant of summary judgment to Mr. Jesurum on their claim for negligent entrustment—excluding the assignment of error regarding the timing of summary judgment, addressed above.  These assignments of error can be condensed into this fundamental point:  had the circuit court considered Petitioners' evidence, it would have found that they have raised genuine issues of material fact so that their

---

[30] *Id*. at 545, 363 S.E.2d at 132.

[31] *Id*. at 544, 363 S.E.2d at 131.

[32] Remand to the circuit court to apply West Virginia law is not necessary, however.  EAN argued below that under Kentucky law, negligent entrustment hinges on a vehicle owner's actual knowledge of the entrustee's incompetence.  *See Cox v. Waits*, No. 2002-CA-002357-MR, 2004 WL 405811, at *2 (Ky. Ct. App. Mar. 5, 2004) ("The common law theory of negligent entrustment is that one who entrusts her vehicle to another whom she knows to be inexperienced, careless, or reckless, or given to excessive use of intoxicating liquor while driving, is liable for the natural and probable consequences of the entrustment.").  And while the circuit court quoted that standard in its order granting summary judgment to EAN, it defined its inquiry as follows:  "in order for the Plaintiffs to overcome the motion for summary judgment there must be facts which could show that at the time of the rental, EAN knew or should have known that Herrera was inexperienced, incompetent or a reckless driver."

Similarly, in granting summary judgment to Mr. Jesurum, the court considered whether he "knew or should have known that Herrera was incompetent to drive the rental vehicle" when he entrusted the Town & Country in Tennessee and whether Petitioners had "offer[ed] any evidence that Jesurum or EAN should have known that Herrera was incompetent at the time of the entrustment" in Kentucky.  Those inquiries mirror the negligent entrustment standard set forth in Syllabus Points 11 and 12 of *Payne v. Kinder*, *infra*, so the circuit court's order contains analysis sufficient for purposes of this review.

[33] Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

negligence-based claims should have been presented to a jury.[34]  We begin by examining the negligent entrustment claim again EAN.

West Virginia adopted the following formulation of negligent entrustment in *Payne v. Kinder*:

> Liability for the negligence of an incompetent driver to whom an automobile is entrusted does not arise out of the relationship of the parties, but from the act of entrustment of the motor vehicle, with permission to operate it, to a person whose incompetency, inexperience, or recklessness is known or should have been known by the owner.
>
> An owner who entrusts his motor vehicle to a person whom he knows, or from the circumstances is charged with knowing, to be incompetent or unfit to drive it is liable for injury inflicted which results from the use of the automobile by the driver if the injury was proximately caused by the disqualification, incompetency, inexperience, intoxication or recklessness of the driver.[35]

"[L]iability for the negligent use of a motor vehicle cannot generally be predicated against the owner at common law, merely because of the ownership of the vehicle."[36]  Instead, owner

---

[34] Petitioners argue that the circuit court granted summary judgment to EAN before they had a full and fair opportunity to conduct discovery.  For support, Petitioners cite to two Rule 56(f) affidavits—one included in the Hammetts' response to EAN's original motion for summary judgment and one included in Mr. Caudill's response to EAN's renewed motion for summary judgment.  In the most recent affidavit, counsel for Mr. Caudill attests that additional discovery is needed regarding the investigation as to how Mr. Herrera came to be listed in EAN's computer as an "authorized driver" of the Town & Country; whether Mr. Bradshaw or his counterpart at EAN Tennessee had discretion to "disregard" certain policies and guidelines; the degree of autonomy of each branch to determine its rental practices; and EAN's employee training programs.  As the following analysis demonstrates, those topics are not relevant to Petitioners' negligent entrustment claim against EAN.  And Petitioners' negligence claim against EAN fails as a matter of law in view of the specific duty owed by EAN to Petitioners, so the relevance of those topics to the negligence claim is moot.

[35] Syl. Pts. 11 and 12, *Payne v. Kinder*, 147 W. Va. 352, 127 S.E.2d 726 (1962).

[36] 8 Am. Jur. 2d AUTOMOBILES & HIGHWAY TRAFFIC § 614 (Feb. 2022).  The vehicle owner may still be liable for injury caused by another's negligent operation of the owner's vehicle under other common law doctrines.  *See id*. (vehicle owner not held liable for injuries caused by other's negligent operation of owner's vehicle "unless the operator was acting as his or her agent or servant, the owner was present in the vehicle and maintained some control over its operation or entrusted its operation to an incompetent or unfit person, or unless the owner and driver were engaged in a joint enterprise or partnership activity") (internal notes omitted).

liability "'rests upon the combined negligence of the owner and the driver—negligence of the owner in entrusting the vehicle to an incompetent driver, and negligence of the driver in its operation.'"[37] "[T]he critical element of a negligent entrustment cause of action is the initial improper loaning of the vehicle—improper in the sense that it is given to a person who is known to be likely to cause an unreasonable risk of harm to others."[38]

In support of its motion for summary judgment, EAN offered evidence showing that Mr. Bradshaw requested and reviewed Mr. Herrera's driver's license, interacted with Mr. Herrera, did not observe signs of impairment or intoxication, and was unaware of Mr. Herrera's driving or criminal history when he entrusted the Explorer to him. The circuit court relied on that evidence to find that Petitioners had not raised a genuine issue of material fact as to whether Mr. Bradshaw knew or should have known that Mr. Herrera was incompetent to operate a vehicle—assuming Mr. Herrera was, in fact, incompetent and the incompetency caused Petitioners' injuries.

Petitioners contend that they have "come forward with affirmative evidence [*i.e.*, a list of twenty-four bulleted facts] that both calls into question the veracity of the evidence offered by EAN, [and] additional evidence of EAN's tortious conduct . . . ." According to Petitioners, this evidence shows "that under EAN's own standards, contained in both the Rental Agreement and internal operating procedures, Herrera should never have been given the [Explorer]. These facts demonstrate that EAN's employee Brent Bradshaw had a wealth of information in front of him telling him that Herrera was not fit to drive." Contrary to Petitioners' assertion, few of the facts they point to are related to Mr. Herrera's competency to operate a vehicle *in a manner that was likely to cause an unreasonable risk of harm to* others. Seventeen of the twenty-four pieces of affirmative evidence relate to Mr. Herrera's status as an "authorized additional driver" on the rental agreement, EAN employees' alleged failure to follow internal policies, and EAN's alleged failure to adopt them.[39] Petitioners do not articulate how that evidence supports their claim for negligent entrustment, other than to argue that the Explorer should never have been entrusted to Mr. Herrera.

---

[37] *Payne*, 147 W. Va. at 370, 127 S.E.2d at 738 (quoting 5A Am. Jur., AUTOMOBILES & HIGHWAY TRAFFIC, § 580).

[38] *Huggins v. Tri-Cty. Bonding Co.*, 175 W. Va. 643, 649, 337 S.E.2d 12, 17 (1985).

[39] *Drummond v. Walker*, 643 F. Supp. 190, 192 (D.D.C. 1986), *aff'd*, 861 F.2d 303 (D.C. Cir. 1988) (reasoning that "[t]he fact that [the driver] was under the age of 21, or lacked adequate identification or credit does not reflect directly on his ability to operate a car competently" so rental car company "would not be on notice by virtue of these facts that [the driver] was not a safe driver").

Mr. Caudill's bulleted list includes two points related to Mr. Herrera and Mr. Jesurum's alleged criminal activities between March 13 and 21. Mr. Caudill has not offered any evidence that Mr. Bradshaw was aware of those alleged activities when he entrusted the Explorer to Mr. Herrera on March 21, 2015. Therefore, even assuming those activities are indicative of Mr. Herrera's competency to drive, they cannot raise a genuine issue of material fact sufficient to evade summary judgment on this claim against EAN.

This is not sufficient to raise a genuine issue of material fact to preserve their claim for negligent entrustment. *Payne v. Kinder* conditions a vehicle owner's liability on the entrustment of a vehicle to one "whom he knows, or from the circumstances is charged with knowing, to be incompetent or unfit to drive[.]" Petitioners have not pointed to any evidence that the at-issue policies and rental agreement terms implicate Mr. Herrera's competency to operate a vehicle without causing an unreasonable risk of harm to others.

Petitioners intimate throughout their briefing that Mr. Herrera's inability to rent a car from EAN and to qualify as an "additional authorized driver" on the rental agreement are relevant to his competency to operate a vehicle, safely. They are not: Mr. Herrera initially was denied a rental car because he did not have a credit card or proof of permanent address. Neither circumstance is material to his competency to operate a vehicle without creating an unreasonable risk of harm.[40] In short, Petitioners' evidence related to EAN's alleged violations of internal policies, failure to adopt internal policies, and failure to enforce the terms of the rental agreement is not material to the question of whether Mr. Herrera was competent to operate a vehicle safely on March 21, 2015.

Petitioners' remaining four bulleted points of affirmative evidence relate to their contention that Mr. Bradshaw should have known that Mr. Herrera was so exhausted on March 21 that he was incompetent to operate a vehicle safely based on Mr. Herrera's appearance or the number of miles accrued on the Town & Country between March 13 and 21.[41] To support those assertions, Petitioners point to an opinion by human-factors expert Dr. Kevin A. Rider that "7,707 miles driven in 8 days will predictably result in driver fatigue, impair the driver's ability and be unfit [sic] to safely operate his vehicle . . . ." Petitioners also highlight the opinion of sleep expert Dr. Charles A. Czeisler that Mr. Herrera was "impaired by profound fatigue and excessive sleepiness" upon his arrival at the EAN Kentucky office. These experts' reports are insufficient to create a genuine issue of fact.

The materiality of Dr. Rider's opinion to Mr. Bradshaw's putative knowledge of Mr. Herrera's competency to operate a vehicle safely is dubious. First, Dr. Rider opines that it is predictable that driving roughly 7,700 miles in eight days will result in driver fatigue. Dr. Rider does not opine that such a driver will *appear* so fatigued that an observer would (or should) know

---

[40] *Cf. Amparan v. Lake Powell Car Rental Co.*, 882 F.3d 943, 949 (10th Cir. 2018) (rental car company's violation of minimum age policy was not evidence of driver's incompetence); *Eagle Express Lines, Inc. v. Nyazee*, No. 4:18-CV-01152-AGF, 2018 WL 6445623, at *3 (E.D. Mo. Dec. 10, 2018) (dismissing plaintiff's claim for negligent entrustment where "drivers' youth and resultant inability to rent a car in their own names does not alone establish incompetence"); *Byrne v. Collins*, 77 A.D.3d 782 (N.Y. App. Div. 2010) (rental car company's "failure to provide copies of any internal policies as to investigation of potential renters with restricted licenses constitutes an insufficient basis upon which to deny [rental car company's] motion for summary judgment" of plaintiff's negligent entrustment claim).

[41] Petitioners also argue that Mr. Bradshaw was "required to look beyond mere appearances to evaluate whether or not [Mr. Herrera was] fit to drive." Confusingly, they later assert that "West Virginia negligent entrustment law imposes no duty on EAN to affirmatively look for evidence of a prospective renter's fitness to operate a motor vehicle."

13

that he is incompetent to operate a vehicle safely. Second, Dr. Rider did not observe Mr. Herrera on March 21, so his opinion does not account for Mr. Herrera' s actual appearance. That is, Mr. Rider has not opined (nor can he) that Mr. Herrera, particularly, appeared so fatigued on that day that a reasonable observer would have known him to be incompetent to drive safely.[42] Dr. Czeisler's opinion suffers similar infirmities.[43]

For that same reason, Petitioners' assertion that Mr. Bradshaw should have known that Mr. Herrera was incompetent to drive on March 21, 2015 based on the mileage accrued on the Town & Country between March 13 and 21 fails. Petitioners' theory relies on the following inferences: Mr. Bradshaw's observations of Mr. Herrera's appearance were not accurate; Mr. Herrera's admission that he gave EAN employees no information that would lead them to believe he was incompetent to drive is untrue; and Mr. Herrera was the only driver of the Town & Country van between March 13 and 21. Courts have rejected similar evidence, such as knowledge of an employee's work schedule and lengthy commute, as sufficient to charge a vehicle owner with constructive knowledge of an entrustee's incompetence to operate a vehicle safely.[44] For these reasons, we affirm the circuit court's grant of summary judgment to EAN on Petitioners' claim for negligent entrustment.

---

[42] *Cf. Weber v. Budget Truck Rental, LLC*, 254 P.3d 196, 199 (Wash. Ct. App. 2011) (finding expert testimony that rental car agency employees should have seen signs that prospective renter was intoxicated based on his methamphetamine use earlier in the day was insufficient to create question of fact for trial because expert opinion went to renter's assumed appearance and not actual appearance).

[43] In addition, both experts acknowledge in their reports that their opinions are predicated on the assumption that Mr. Herrea had been the only person to drive the Town & Country between March 13 and 21. The evidence Petitioners proffer to fill that gap is limited to a portion of Mr. Bradshaw's deposition in which he states that "the only person he saw driving was during the switch-out was Mr. Herrera. He arrived in the Town & Country and left in the Ford Explorer." Petitioners have not directed the Court to another portion of the record to support the assumption that Mr. Herrera was the only driver of the Town & Country between March 13 and 21, and Mr. Bradshaw's deposition testimony supports only the conclusion that Mr. Herrera was the driver of the van for a limited period on a single day. As Mr. Bradshaw stated in his deposition, to his knowledge, Mr. Jesurum was also a possible driver of the van because his name was on the rental agreement.

[44] *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007) (reasoning that employer's "knowledge of [employee]'s work schedule and his commute, without more, does not raise a fact issue that he was [incompetent], or that [employer] knew or should have known that he was, an incompetent driver due to insufficient sleep"); *Eagle Express Lines*, 2018 WL 6445623, at *4 (concluding that plaintiff failed to state a claim for negligent entrustment premised, in part, on allegation that driver was unfit due to sleep deprivation where plaintiff "fail[ed] to supply authority for the premise that drowsiness is tantamount to incompetence in an entrustment context" and the "potentially infinite application of this theory in this particular context").

14

### 3. NEGLIGENCE BY EAN

Petitioners also appeal the circuit court's order granting summary judgment to EAN on their negligence claim,[45] arguing that they have offered evidence that EAN failed to conduct its business as a prudent rental car company would because it (1) provides no uniform guidance to its various branches regarding the renting and "switching out" of vehicles; (2) does not require its employees to adhere to the guidelines that do exist; (3) and did not train Mr. Bradshaw on the issue of driver fatigue. EAN responds that "under West Virginia law, a vehicle owner' s liability for the negligent acts of the vehicle's operator sounds only in negligent entrustment." Petitioners reply that the evidence they offer in response to EAN's motion for summary judgment is unrelated to Mr. Bradshaw's entrustment of the Explorer to Mr. Herrera and that his direct negligence claim serves as an independent theory of liability.

"No action for negligence will lie without a duty broken,"[46] and "[w]hether there is a duty of care owed to another is a question that must be determined as a matter of law by the court."[47] In view of those precepts, the question presented by Petitioners' direct negligence claim becomes what duty of care is owed by the owner of a motor vehicle (EAN) to third parties such as T.M., C.M., and Haylie Hammett who are injured by the negligent or reckless operation of the owner's vehicle by a permissive user (Mr. Herrera)? That question was answered in *Payne*: the owner of a motor vehicle owes to third parties a duty to refrain from entrusting his motor vehicle "to a person whose incompetency, inexperience, or recklessness is known or should have been known by the owner." That is, the vehicle owner owes the third party a limited duty not to entrust his vehicle to a person whom he knows (or should know) "is so incompetent as to the handling of same as to convert it into a dangerous instrumentality[.]"[48]

In view of that limited duty, Petitioners' general negligence claim against EAN fails as a matter of law. While Petitioners scrupulously avoid the word "entrust" in the list of facts they contend support their negligence claim—they use "release"—their theory is clear: had EAN implemented uniform policies, required employees to follow them, and trained Mr. Bradshaw on driver fatigue, then Mr. Bradshaw would not have entrusted the Explorer to Mr. Herrera. The general duty of care assumed by that theory does not account for Petitioners' position relative to EAN. That matters because

---

[45] *See Hersh v. E-T Enterprises, Ltd. P'ship*, 232 W. Va. 305, 310, 752 S.E.2d 336, 341 (2013) (superseded by statute on other grounds as recognized in *Tug Valley Pharmacy, LLC v. All Plaintiffs Below In Mingo County*, 253 W. Va. 283, 773 S.E. 2d 627 (2015)).

[46] Syl. Pt. 1, in part, *Parsley v. General Motors Acceptance Corp.,* 167 W. Va. 866, 280 S.E.2d 703 (1981).

[47] *Yourtee v. Hubbard*, 196 W. Va. 683, 689, 474 S.E.2d 613, 619 (1996).

[48] *Gardiner v. Solomon*, 75 So. 621, 623 (Ala. 1917). *Payne* cited *Gardiner* with approval. *See Payne*, 147 W. Va. at 371, 127 S.E.2d at 738.

to form the basis for a valid cause of action, this [general duty] must be brought home to the particular plaintiff, for "a duty owing to everybody can never become the foundation of an action until some individual is placed in position which gives him particular occasion to insist upon its performance . . ."[49]

Brought home to Petitioners, EAN's duty is limited to that provided for in *Payne*: to refrain from entrusting a motor vehicle "to a person whose incompetency, inexperience, or recklessness is known or should have been known by the owner."[50] As detailed above, the evidence proffered by Petitioners in support of their appeal from the circuit court order granting summary judgment to EAN does not raise a genuine issue of material fact that Mr. Bradshaw knew or should have known that Mr. Herrera was incompetent to operate a vehicle safely when Mr. Bradshaw entrusted the Explorer to him on March 21. For those reasons, the circuit court correctly granted summary judgment to EAN on Petitioners' direct negligence claim.[51]

### 4. NEGLIGENT ENTRUSTMENT BY MR. JESURUM

The circuit court granted summary judgment to Mr. Jesurum on Petitioners' claim of negligent entrustment applying Kentucky and Tennessee law. But as we concluded above, the West Virginia law of negligent entrustment applies to the claim, so we consider Petitioners' argument in view of the standard established in Syllabus Points 11 and 12 of *Payne*.

---

[49] *Robertson v. LeMaster*, 171 W. Va. 607, 611, 301 S.E.2d 563, 567 (1983) (quoting T. Cooley, LAW OF TORTS § 478 (4th ed. 1932)) (holding that an employer violated a duty of care by allowing an exhausted employee to drive himself home when it was foreseeable that employee would injure others due to his exhaustion; employer had required employee to work over twenty-seven hours without rest, employee had asked to be relieved from duty due to exhaustion, and employee had been observed falling asleep after shift).

[50] Syl. Pt. 11, *Payne*, 147 W. Va. at 352, 127 S.E.2d at 729.

[51] Citing the Restatement of Torts (2d.) § 324A, Petitioners suggest that it is the practice of employees at EAN Tennessee to check the criminal records of prospective drivers, so that EAN has assumed a duty to check criminal records and Mr. Bradshaw violated that duty by not doing so before entrusting the Explorer to Mr. Herrera. Petitioners argue that had Mr. Bradshaw done so, then he would have discovered Mr. Herrera's criminal background and, presumably, not entrusted the car to him. As Petitioners concede, this Court has not adopted that section of the Restatement. Even if the Court were to do that, the single page cited by Petitioners to establish that EAN has assumed a duty to check prospective renters' criminal backgrounds does not raise a genuine issue of material fact. On its face, the page shows that any inquiry into a prospective renter's background is predicated on a computer-generated "warning prompt" and a "Risk Management related message[] (DX claims, Conversion, thefts, arrests, impounds, etc. . . . .)." Petitioners have not identified a portion of the record to support the inference that Mr. Herrera's particular criminal history would have generated a "warning prompt" and "Risk Management related message."

16

The court approached Petitioners' claim in two steps. It first examined the entrustment of the Town & Country to Mr. Herrera on March 13, then the entrustment of the Explorer to him on March 21. The court's decision rested largely on its finding that Petitioners failed to offer sufficient material evidence to raise a genuine issue of fact as whether Mr. Jesurum knew or should have known of Mr. Herrera's incompetence to operate a vehicle safely on either day.

On appeal, Petitioners argue that genuine issues of material fact remain as to whether Mr. Jesurum knew or should have known about Mr. Herrera's competency to operate a vehicle. That is so, they contend, because Mr. Jesurum entrusted the Town & Country and the Explorer to Mr. Herrera to further a criminal enterprise, dictated Mr. Herrera's driving schedule, and—on the night before or morning of the collision—encouraged Mr. Herrera to continue driving although Mr. Herrera had expressed to Mr. Jesurum that he was tired. Petitioners also argue that when Mr. Jesurum entrusted the Town & Country to Mr. Herrera in Tennessee, he was aware that Mr. Herrera would drive long distances in a short period for an allegedly criminal purpose.[52] Petitioners again raise the question of whether Mr. Herrera was an additional authorized driver of the Town & Country or Explorer and the alleged breach of the rental agreement.

Mr. Jesurum responds that Petitioners' evidence regarding a criminal enterprise is specious and immaterial to the claim of negligent entrustment. Mr. Jesurum argues that Petitioners' speculation that he controlled Mr. Herrera after entrusting the Town & Country is immaterial to the claim of negligent entrustment. Finally, Mr. Jesurum argues that Petitioners have offered no evidence that he knew or should have known that Mr. Herrera was incompetent or unable to drive a vehicle.

We concur with Mr. Jesurum that Petitioners have not offered evidence sufficient to a raise a genuine issue of *material* fact to prevent summary judgment of their claim for negligent entrustment. Mr. Jesurum had met Mr. Herrera shortly before renting the Town & Country in Cleveland, Tennessee. He viewed Mr. Herrera's Florida driver's license (identifying Mr. Herrera as a "safe driver") before entrusting the Town & Country to him. So, when Mr. Jesurum entrusted the Town & Country to Mr. Herrera, he knew that Mr. Herrera was a licensed driver and, based on their brief acquaintance, had no actual knowledge that would indicate that Mr. Herrera was likely to not operate a vehicle safely.

Petitioners do not appear to suggest that Mr. Jesurum should have undertaken an additional investigation of Mr. Herrera's licensure, so we turn to their arguments that in the circumstances Mr. Jesurum was chargeable with knowledge that Mr. Herrera was unfit to drive. It is already determined that Mr. Herrera's inability to rent a vehicle from EAN or to qualify as an additional authorized driver of a rental vehicle does not reflect on his competency to operate a vehicle—only

---

[52] Petitioners also argue that the circuit court erred by failing to give due weight to their experts' opinions regarding the probability that a person who has driven approximately 7,700 miles in eight days will be extremely exhausted. These opinions do not establish that Mr. Herrera appeared so fatigued that a reasonable person would know him to be incompetent to operate a vehicle, safely, when Mr. Jesurum entrusted the vehicle to him on March 8 or that Mr. Jesurum should have known that Mr. Herrera, particularly, was exhausted to the point of impairment when the Explorer was entrusted to him on March 21.

on his lack of credit and proof of permanent address.[53]  Similarly, and as discussed above, the alleged violation of the rental agreement does not demonstrate that Mr. Herrera was incompetent to operate a vehicle safely.

Petitioners offer the transcript of a statement given by Mr. Herrera to authorities following the collision to demonstrate that Mr. Herrera was entrusted with the Town & Country to transport undocumented immigrants across the country in exchange for payment.   As troubling as the contents of that transcript may be, it is not *material* evidence[54] sufficient to establish a genuine issue of disputed fact as to Petitioners' negligent entrustment claim against Mr. Jesurum under *Payne*.  Under that standard, owner liability "rests upon the combined negligence of the owner and the driver—negligence of the owner in entrusting the vehicle to an *incompetent* driver, and negligence of the driver in its operation."[55]  Taking all inferences in Petitioners' favor, a reasonable juror might conclude that Mr. Jesurum increased the risk posed to others on the road by sending Mr. Herrera out on a criminal errand.  But that conclusion does not support liability for negligent entrustment because it rests on the alleged *purpose* of Mr. Herrera's trip to Mesa, Arizona, and not his *competency* to operate a vehicle safely as known to Mr. Jesurum at the time of entrustment.

We briefly address Petitioners' arguments regarding Mr. Jesurum's liability for the alleged negligent entrustment of the Explorer to Mr. Herrera on March 21, 2015.  Mr. Jesurum was not present when Mr. Bradshaw entrusted the Explorer to Mr. Herrera and so could not assess Mr. Herrera's appearance.  In view of Mr. Jesurum's absence, Petitioners look to Mr. Herrera's statement to authorities.  There, Mr. Herrera reported that sometime *after* he picked up the Explorer and before the collision, he told a man (presumably Mr. Jesurum) that he was tired.  The man reportedly responded no, "[g]et up, let's go."  This reported interaction occurred after the entrustment of the Explorer to Mr. Herrera on March 21, 2015.  "[T]he critical element of a negligent entrustment cause of action is the *initial* improper loaning of the vehicle[,]"[56] so this interaction does not bear on what Mr. Jesurum knew or should have known at the time the Explorer

---

[53] *See Bakali v. Jones*, No. CV 17-1162, 2018 WL 3375164, at *3 (W.D. Pa. July 11, 2018) (dismissing negligent entrustment claim against rental car company even though drivers were not named as "permitted drivers under the rental agreement" because that did "not indicate that they were 'incompetent' as drivers, nor does the fact that the men were under the age of 25 and would not have been authorized drivers under the rental agreement").

[54] Respondents assert that the statement is inadmissible, but do not include any argument or legal authority to support that assertion.  Therefore, the issue of admissibility of the statement is not sufficiently developed to allow this Court to consider the issue.  *See State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) ("appellate courts frequently refuse to address issues that appellants, or in this case the appellee, fail to develop in their brief").

[55] *Payne*, 147 W. Va. at 370, 127 S.E.2d at 738 (quoting 5A Am.Jur., AUTOMOBILES AND HIGHWAY TRAFFIC, § 580) (Emphasis added).

[56] *Huggins*, 175 W. Va. at 649, 337 S.E.2d at 17 (Emphasis added).

18

was entrusted to Mr. Herrera.  For those reasons, Petitioners have not shown that a genuine issue of material fact remains on their claim of negligent entrustment against Mr. Herrera.[57]

## C.      CONSPIRACY AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY EAN, RIS, & EMPIRE

In June 2017, Petitioners amended their complaint to add claims for IIED and conspiracy against EAN, RIS, and EMPIRE.  As explained in their brief on appeal, Petitioners contend that "EAN, RIS and Empire conspired to defeat both insurance coverage [under the SLP] for the collision in this case and a direct recovery against EAN."  Petitioners continue:

> Specifically, the insurance policy sold by EAN to Jesurum has a one million dollar ($1,000,000) self-insured retention, RIS is a captive third-party administrator for the insurance policy, and Empire is the underwriter.  Documentary evidence shows that RIS, working together with Empire, originally denied and disclaimed coverage under the policy on the grounds that Herrera was not an authorized driver of the rental vehicle.  RIS and Empire went on to revise the denial by "questioning" coverage due to information that Herrera might have been intoxicated at the time of the collision.  By reversing their reasoning for the original denial of coverage and asserting the possibility of a coverage denial based on intoxication, EAN, RIS and Empire effectively foreclosed Petitioners from any meaningful recovery.[58]

Petitioners conclude that a reasonably jury "could conclude that those actions satisfy the elements of a cause of action for intentional infliction of emotional distress . . . ."  We disagree.

The elements of a claim for IIED are well-settled:

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress

---

[57] As EAN observes, Petitioners have not sought to hold Mr. Jesurum liable for their injuries under other theories.

[58] Emphasis in original.

suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.[59]

We agree with EAN, RIS, and Empire that Petitioners have not raised a genuine issue of material fact as to their claim for IIED. Petitioners broadly contend that they have "produced sufficient evidence to show that EAN, RIS, and Empire conspired to defeat both insurance coverage for the collision at issue in this case and a direct recovery against EAN." Practically, the record reflects that coverage-limits offers have been made to Petitioners, but that they have not accepted those offers because they object to certain provisions or condition included in those offers.

Petitioners cannot succeed on a civil conspiracy theory, alone. "A civil conspiracy is not a *per se,* stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)."[60] In other words, a civil conspiracy is not actionable unless there is a tort at its center—here, IIED, per the allegations in Petitioners' amended complaint. Petitioners' evidence in support of their IIED claim includes three coverage letters sent by Empire to Mr. Jesurum and Mr. Herrera on March 13, 2015; April 6, 2015; and February 15, 2016. While Petitioners may have been distressed by the information conveyed to Mr. Jesurum and Mr. Herrera in those letters, the act of sending a coverage letter to Mr. Jesurum and Mr. Herrera is not, standing alone, extreme, outrageous, or indecent.

Petitioners also offer evidence of interactions between the RIS claims investigator and an Empire claims supervisor during the investigation of coverage for Mr. Herrera under the SLP purchased by Mr. Jesurum. Petitioners assert that the initial declination of coverage based on Mr. Herrera's status as an unauthorized driver accords with relevant training materials but that the later rescission of that declination was improper and out of the ordinary. Petitioners make no argument as to how that series of events is extreme, outrageous, or beyond the bounds of decency as to them—third parties to the SLP insurance contract. Petitioners make the vague argument that "[t]here is a strong factual inference that if Herrera was not an authorized driver under the Rental Agreement, EAN could be held directly liable for the collision at issue in the underlying action," but they do not ground that inference in the elements of a claim for IIED.

Ultimately, Petitioners have failed to raise a genuine issue of material fact to preserve their IIED claim against EAN, RIS, or Empire. They have not identified an action so extreme and outrageous as to exceed the bounds of decency. While Petitioners assert that the claims investigator and supervisor's actions went against their company training, they offer no evidence of either person's intent to cause them emotional distress or that either disregarded the certainty (or substantial certainty) that emotional distress to Petitioners would result from their conduct. Furthermore, Petitioners have not directed this Court to any portion of the record regarding causation; that is, if outrageous conduct had occurred, that it "was actually caused by the

---

[59] Syl. Pt. 3, *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998).

[60] Syl. Pt. 9, *Dunn v. Rockwell*, 225 W. Va. 43, 689 S.E.2d 255 (2009).

perpetrator's misconduct rather than by another source."[61]  Finally, Petitioners have not pointed to evidence in the record to substantiate that any emotional distress they suffered due to the determination of coverage under the SLP was so severe that no reasonable person could be expected to endure it.  For these reasons, we affirm the circuit court's grant of summary judgment to EAN, RIS, and Empire on Count X of Petitioners' amended complaint.

## IV. CONCLUSION

For foregoing reasons, the orders of the Circuit Court of Raleigh County of February 12, 2020 (granting summary judgment to RIS and Empire); March 11, 2020 (granting summary judgment to Mr. Jesurum); and December 16, 2020 (granting summary judgment to EAN)—as amended by the circuit court's order of February 11, 2021—are affirmed.

AFFIRMED

**ISSUED: April 26, 2022**

**CONCURRED IN BY:**
**Justice Elizabeth D. Walker**
**Justice Tim Armstead**
**Justice Alan D. Moats sitting by temporary assignment.**

**WRITING SEPARATELY:**
**Justice William R. Wooton**
**Judge Bridget Cohee, sitting by temporary assignment.**

**Chief Justice John A. Hutchison, disqualified.**

---

[61] *Travis*, 202 W. Va. at 379*, 504 S.E.2d at 429 (quoting *Hakkila v. Hakkila,* 812 P.2d 1320, 1324 (N.M. App. 1991)).

No. 21-0096 – *William Caudill, duly appointed guardian of minor infants T.M. and C.M.; Charles Samuel Hammett; Kimberly Dawn Hammet; and Haylie Hammett v. EAN Holdings, LLC, d/b/a Enterprise Rent-a-Car; Buenaventura Jesurum; Empire Fire and Marine Insurance Company; and Rental Insurance Services, Inc.*

Wooton, Justice, concurring, in part, and dissenting, in part, and joined by Judge Cohee:

I concur in the majority's judgment with respect to the petitioners' claims against respondents EAN Holdings, LLC, d/b/a Enterprise Rent-a-Car ("EAN"), Empire Fire and Marine Insurance Company ("Empire"), and Rental Insurance Services, Inc. ("RIS") that are based on these entities' alleged conspiracy to deny insurance coverage; although these causes of action are designated as claims involving "conspiracy" and "intentional infliction of emotional distress," they are at their core third-party bad faith claims which have long since been abolished in West Virginia.[1] I further concur in the majority's application of West Virginia law to all issues in this case, as our precedents make clear that in a case such as this, where one West Virginia resident was killed and three others badly injured in an accident that occurred in West Virginia, our courts apply the doctrine of *lex loci delicti*: the substantive rights of the parties are determined by the law of the place of injury. *See*, *e.g.*, *Vest v. St. Albans Psychiatric Hosp., Inc.*, 182 W. Va. 228, 229, 387 S.E.2d 282, 283 (1989) ("In tort cases, West Virginia courts apply the traditional choice-of-law rule, *lex loci delicti;* that is, the substantive rights between the parties are determined by the law of the place of injury.") (citation omitted). Finally, I concur with the majority's determination that the petitioners were not denied due process of law as a result of the somewhat confusing sequence of events leading up to the circuit court's grant of summary judgment for respondents Empire, RIS, and Buenaventura Jesurum ("Mr. Jesurum"). Although it seems clear that the petitioners did not anticipate what seemed – to them, at least – to be the rapid resolution of these respondents' summary judgment motions, it is reasonable to conclude that in the nearly four years the case had been pending, the petitioners had ample time to do discovery and prepare to present or respond to dispositive motions.

---

[1] "Neither common law nor statutory third-party bad faith claims now exist in this State. This Court held in the syllabus of *Elmore v. State Farm Mutual Automobile Insurance Company*, 202 W. Va. 430, 504 S.E.2d 893 (1998), that '[a] third party has no cause of action against an insurance carrier for common law breach of the implied covenant of good faith and fair dealing or for common law breach of fiduciary duty.' Statutory third-party bad faith claims were abolished by the Legislature in W. Va. Code § 33-11-4a (2005)." *State ex rel. State Auto Prop. Ins. Cos. v. Stucky*, No. 15-1178, 2016 WL 3410352, at *3 n. 2 (W. Va. June 14, 2016) (memorandum decision).

However, I part company with the majority with respect to its resolution of the negligence-based claims against EAN and Mr. Jesurum. Disputed facts, and any inferences which may be drawn from those facts, must be viewed in the light most favorable to the petitioners when reviewing the lower court's grant of summary judgment. *See Alpine Prop. Owners Assoc., Inc., v. Mountaintop Dev. Co.,* 179 W.Va. 12, 17, 365 S.E.2d 57, 62 (1987) ("In determining on review whether there is a genuine issue of material fact between the parties, this Court will construe the facts 'in a light most favorable to the losing party.'") (citation omitted); *Williams v. Precision Coil,* 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995) ("In assessing the factual record, we must grant the non-moving party the benefit of inferences, as '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [.]'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Notwithstanding this clear directive, the majority opinion assumes material facts that are in dispute – facts that should have been resolved by a jury – and resolves them all in favor of the respondents.

It is well established in this Court's jurisprudence that

> [l]iability for the negligence of an incompetent driver to whom an automobile is entrusted does not arise out of the relationship of the parties, but from the act of entrustment of the motor vehicle, with permission to operate it, to a person whose incompetency, inexperience, or recklessness *is known or should have been known* by the owner.

Syl. Pt. 11, *Payne v. Kinder,* 147 W.Va. 352, 127 S.E.2d 726 (1962) (emphasis added).

Further:

> An owner who entrusts his motor vehicle to a person whom he knows, or from the circumstances is charged with knowing, to be incompetent or unfit to drive it is liable for injury inflicted which results from the use of the automobile by the driver if the injury was proximately caused by the disqualification, incompetency, inexperience, intoxication or recklessness of the driver."

*Id*. at 352, 127 S.E.2d at 729, Syl. Pt. 12; *see also Clark v. Shores*, 201 W. Va. 636, 499 S.E.2d 858 (1997); *Huggins v. Tri-County Bonding Co*., 175 W. Va. 643, 646 n.5, 337 S.E.2d 12, 15 n.5 (1985). With this in mind, let us examine the evidence of what facts were known, or should have been known, to EAN and/or Mr. Jesurum.

23

With respect to EAN, we begin with the replacement transaction in Kentucky, because there is no evidence that at the time of the initial rental to Mr. Jesurum in Tennessee, EAN, through its representative Mr. Moore,[2] knew or should have known that Mr. Herrera rather than Mr. Jesurum would be driving the vehicle. Although none of the following facts and circumstances are dispositive, they are more than sufficient, considered together and in light of the fact that on motion for summary judgment all inferences must be drawn in favor of the non-moving party or parties,[3] to defeat EAN's motion for summary judgment on the negligent entrustment claim.

First, EAN, through its representative Mr. Bradshaw,[4] knew or should have known that Mr. Herrera was not an authorized driver, as the following was entered on the line of the written, signed lease contract provided for "Identification of Additional Authorized Drivers": NO OTHER DRIVERS PERMITTED. *See Payne*, 147 W. Va. at 352, 127 S.E.2d at 729, Syl. Pt. 12 (owner liable for negligent entrustment where "the injury was proximately caused by the disqualification . . . of the driver.") In the instant case, it can hardly be disputed that there was no ambiguity as to Mr. Herrera's disqualification to operate the vehicle, despite what appears to have been a last-second attempt by Mr. Jesurum to muddy the waters by convincing Mr. Moore, EAN's representative in Tennessee, to enter false information into ECARS, the company's computer system. At oral argument, EAN resorted to arguing that this point is a "red herring"; more accurately, it can be characterized as a red flag that there are unresolved facts in dispute which are not favorable to EAN. When counsel were queried about this issue, three different answers were given as to how and when Mr. Herrera was added as a driver in the computer system.[5]

---

[2] At the time of the relevant events, Ryan Moore was Enterprise's agent in the Tennessee office.

[3] *See Painter v. Peavy,* 192 W.Va. 189, 192, 451 S.E.2d 755, 758 (1994) ("We, therefore, must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion."). Indeed, "[s]ummary judgment should be denied 'even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.'" *Williams,*194 W.Va. at 59, 459 S.E.2d at 336 (citation omitted).

[4] At the time of the relevant events, Brent Bradshaw was its agent in the Kentucky office.

[5] Indeed, the fact that Mr. Moore, EAN's representative in Tennessee, added Mr. Herrera as an authorized driver on the electronic version of the lease form, (a) pursuant to a phone request by Mr. Jesurum, something strictly prohibited by Enterprise's rules, (b) eight days after the fact, and (c) just in time for Mr. Herrera to obtain a replacement car in

Second, EAN also knew, or should have known since the fact was readily apparent on the face of the lease contract, that the contract had been violated when Mr. Herrera showed up in Kentucky, because the document clearly stated – again, in capital letters – that PERMISSION GRANTED TO OPERATE VEHICLE ONLY IN THE STATE OF RENTAL AND THE FOLLOWING STATES (none listed). In this regard, the lease contract was clear that "[i]n the event of any violation of the limits on use or other provision of this Agreement, Owner automatically, without any further notice to Renter or [Additional Authorized Drivers], terminates their right to use Vehicle[.]" In short, at the time Mr. Bradshaw handed Mr. Herrera the keys to a replacement vehicle, *no one* was authorized to drive it, because the violation of the lease agreement automatically terminated both Mr. Jesurum's rights and Mr. Herrera's rights (assuming arguendo that the latter had any rights).

Third, from his inspection of the vehicle's odometer Mr. Bradshaw knew or should have known, as a matter of simple arithmetic, that Mr. Herrera had driven 7,714 miles in fewer than eight days,[6] a punishing schedule heavily suggestive of driver fatigue. In this regard, Mr. Bradshaw's testimony, which can fairly be summarized as "he didn't look tired," was not dispositive, as the circuit court implicitly found, on the question of Mr. Herrera's mental state and fitness to drive. A jury could reasonably conclude that someone who has driven almost 1,000 miles per day for eight straight days – assuming a rate of 60-65 miles per hour, which seems generous considering the necessity for fuel breaks, food breaks, and comfort breaks, that adds up to 15-17 hours on the road every day for more than a week – was not fit to get right back into the car and keep on going. A jury could further reasonably conclude that Mr. Bradshaw should have known this, or at least made inquiries about it.

Fourth, when Mr. Bradshaw checked the hastily added additional authorized driver information in the ECARS system, he knew or should have known that something was "off"; neither Mr. Herrera's address nor the spelling of his name matched the

---

Mr. Jesurum's absence, could well lead a jury to conclude that "[s]omething is rotten in the state of Denmark." WILLIAM SHAKESPEARE, HAMLET act 1, sc. 4, l. 90. Further adding to the inference of wrongdoing attributable to EAN, both of the involved agents initially lied when questioned about this matter during Enterprise's internal post-accident investigation into how and why Mr. Herrera had been able to secure a replacement vehicle.

[6] When Mr. Jesurum rented the vehicle in Tennessee the mileage on the odometer was 38,296; when Mr. Herrera arrived in Kentucky, the mileage was 45,995.

corresponding information on his driver's license,[7] and no fee had been charged for adding an additional driver – yet another violation of standard EAN practice in the absence of an express waiver.[8]

Fifth, although EAN had a computer system for screening potential renters, it failed to utilize that system despite the existence of numerous red flags: Mr. Herrera showed up in Kentucky in a vehicle he wasn't authorized to drive, in a state where he wasn't authorized to be, and with a driver's license containing information that didn't match the information in the ECARS system. Petitioners allege that had Mr. Bradshaw run the screening program, he would have discovered that Mr. Herrera had a significant criminal record.[9] In this regard, RESTATEMENT (SECOND) OF TORTS § 324A (AM. L. INST. 1979) provides that

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm[.]

Although this Court has not formally adopted the foregoing principle of law into its jurisprudence, this case would provide an excellent vehicle for analyzing the issue in depth.[10]

---

[7] The address listed was Mr. Jesurum's address in Texas. Mr. Herrera's license identified him as a resident of Florida. Given this discrepancy, a jury could reasonably conclude that Mr. Bradshaw had a duty to ascertain whether the Florida license was even valid.

[8] The ECARS entry contained no such waiver.

[9] It may be a stretch to call Mr. Herrera's record "substantial," as it consisted of only two misdemeanor offenses and one summary offense, all arising from the same incident. However, this was relevant information for the jury to consider in determining whether EAN negligently entrusted a vehicle to Mr. Herrera in light of all the facts and circumstances its agents knew or should have known.

[10] We recognized but did not adopt this principle in *Triad Insulation, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. 12-1110, 2013 WL 3184656 (W. Va. June 24, 2013) (memorandum decision), because it was not applicable to the facts of that case.

Sixth, Enterprise had no uniform policies and procedures in place, and did no training on, issues such as driver fatigue – a significant factor in highway safety, according to the unrebutted testimony of Lloyd Rae, one of petitioners' experts. Amazingly, the circuit court rejected this expert's opinions on the ground that "[t]he opinions . . . are just that, opinions." In so finding, the court clearly crossed the line between the role of the judge and the role of the factfinder: although "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court," Syl. Pt. 3, in part, *State ex rel. Jones v. Recht*, 221 W. Va. 380, 655 S.E.2d 126 (2007), "[t]he jury, and not the trial judge, determines the weight to be given to the expert's opinion." *Id.* at 382, 655 S.E.2d at 128. Syl. Pt. 5, in part (citing Syl. Pt. 4, *Mayhorn v. Logan Med. Found.*, 193 W. Va. 42, 454 S.E.2d 87 (1994)). With respect to Mr. Rae's opinions, I also take issue with any notion that it is up to this Court to set the standard of care for the car rental industry, as suggested by respondents' counsel at oral argument. The record in this case shows that Mr. Rae had "specialized knowledge [which would] assist the trier of fact to understand the evidence or to determine a fact in issue,"[11] and the circuit court was clearly wrong to summarily dismiss his opinions.

With respect to Mr. Jesurum, I am at a loss to discern how the circuit court, or a majority of this Court, could possibly find the petitioners' evidence insufficient to meet the *Payne* test for negligent entrustment. According to the statement of Mr. Herrera – whose credibility was a matter for the jury, not for the judge[12] – it was Mr. Jesurum who recruited him for the specific purpose of embarking on a cross-country journey whose purpose was to transport undocumented immigrants. In order to keep him going, even over his protests of fatigue, Mr. Jesurum supplied him with cocaine and a 19-year-old female companion. Based on these facts and circumstances, if believed, a jury could reasonably find that Mr. Jesurum knew or should have known that after days of driving long distances without sufficient rest, fueled only by cocaine and the ministrations of the companion, and under the constant stress of avoiding any actions that might bring law enforcement into play,[13] Mr. Herrera was an incompetent, intoxicated, and/or reckless driver. Indeed, I am hard-pressed to imagine any reasonable argument to the contrary.

---

[11] W. Va. R. Evid. 702(a).

[12] This is a legal axiom, a proposition that is so fundamental it requires no citation of authority.

[13] Indeed, it seems likely that all of these factors came into play immediately prior to the fatal accident, as Mr. Herrera became confused about where he was going and passed through the same tollbooth twice; then, afraid of attracting any attention to his vehicle, he decided to avoid going through the tollbooth yet again by turning his vehicle northbound into incoming traffic on the southbound lane.

27

The circuit court "backstopped" its resolutions of both EAN's and Mr. Jesurum's summary judgment motions by finding that Mr. Herrera's actions were both inexplicable and illegal, and as such constituted superseding and intervening causes of the fatal crash. Under the facts and circumstances of this case, this issue was one for the jury to resolve, under proper instructions as to the law. *See* Syl. Pt. 2, *Evans v. Farmer*, 148 W.Va. 142, 133 S.E.2d 710 (1963) ("The questions of negligence, contributory negligence, proximate cause, *intervening cause* and concurrent negligence are questions of fact for the jury where the evidence is conflicting or when the facts, though undisputed, are such that reasonable [persons] draw different conclusions from them.") (emphasis added). As to the issue of intervening cause, this Court held in *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 209 W. Va. 318, 547 S.E.2d 256 (2001), that

> if a first act of negligence sets off a chain of events or creates a situation ultimately resulting in injury, then such negligence may very well constitute the proximate cause of said injury, even if intervening negligence occurs. *Evans v. Farmer,* 148 W.Va. 142, 154–156, 133 S.E.2d 710, 717–718 (1963). Additionally, where two or more persons are guilty of separate acts of negligence which in point of place and time concur, and together proximately cause or contribute to the injuries of another, such persons are guilty of concurrent negligence for which they may be held jointly and severally liable. Syllabus Point 1, *Reilley v. Byard,* 146 W.Va. 292, 119 S.E.2d 650 (1961). *In accord,* Syllabus Point 5, *Kodym v. Frazier,* 186 W.Va. 221, 412 S.E.2d 219 (1991).

> An intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury. Syllabus Point 3, *Wehner v. Weinstein,* 191 W.Va. 149, 444 S.E.2d 27 (1994).

*Sheets*, 209 W. Va. at 332, 547 S.E.2d at 270 (footnote omitted); *see also* Syl. Pt. 13, *Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990) ("A tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts of third persons if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct."). In short, whether a negligent act,

28

or even a deliberate act, is sufficient to break the causal chain, is a fact-based question that can seldom be resolved as a matter of law.[14]

With these principles in mind, we turn first to what every first-year law student knows as the "but for" test: but for the negligence of EAN and Jesurum, would the fatal crash have occurred? In my view, based on the facts and circumstances detailed *supra*, a jury could reasonably conclude that the actions of these respondents "set[] off a chain of events or create[d] a situation ultimately resulting in injury" and thus was a proximate cause of the crash, notwithstanding the intervening negligence of Mr. Herrera. *Evans*, 148 W. Va. at 154, 133 S.E.2d at 717. Respondent EAN entrusted Mr. Herrera with the keys to a vehicle he was not authorized to drive – despite the best efforts of its employee, Mr. Moore, to sneak a new term into the lease after it had already been terminated.[15] The

---

[14] *See*, *e.g.*, *Morris v. Corder*, 246 W. Va. 1, 866 S.E.2d 66 (2021), where we held that

> [f]inally, we dispense with respondents' contention that a reversal of the circuit court's ruling would abrogate our purported prior determination that "*as a matter of law*, non-custodial suicide constitutes an intervening, superseding act that undercuts any attachment of duty." (emphasis added). Respondents cite no authority for this boldly stated proposition and, in fact, the very case upon which they rely—*Moats [v. Preston Cnty. Comm'n, 206 W. Va. 8, 521 S.E.2d 180 (1999)]* —plainly undermines it. Aside from dicta making a general, historical observation that suicide has been treated as an intentional act, this Court has never found it to be an outright bar as a matter of law[.]

*Morris*, 246 W. Va. at __, 866 S.E.2d at 71. We distinguished our earlier decision in *Harbaugh v. Coffinbarger*, 209 W. Va. 57, 543 S.E.2d 338 (2000), where we concluded as a matter of law that in the absence of any evidence showing other individuals present during a game of Russian Roulette had aided, abetted, or in any way encouraged the decedent to play the game, his death was caused solely by his decision to load a gun, put the barrel to his forehead, and pull the trigger – twice. *Harbaugh*, 209 W. Va. at 65, 543 S.E.2d at 346. In *Morris*, we noted that "[t]he *Harbaugh* Court paused to emphasize[] the significant role of the concept of foreseeability in the determination of intervening cause[,]" 246 W. Va. at __, 866 S.E.2d at 71-72, thus signaling that *Harbaugh* was a unique decision based on a unique set of facts.

[15] As discussed in more detail *supra*, Mr. Herrera's very appearance in Kentucky put Mr. Bradshaw on notice that the lease had been violated, as it was clearly specified therein that the vehicle could not be driven outside of Tennessee.

discrepancy between the information in the company's computer (Mr. Moore's attempt to alter history) and the information in Mr. Herrera's license put Mr. Bradshaw on notice that something was amiss, and that Mr. Herrera's Florida license might not be valid. The mileage shown on the odometer put Mr. Bradshaw on notice that Mr. Herrera had been driving close to 1,000 miles per day for more than a week, thus putting Mr. Bradshaw on notice that the driver, unauthorized and possibly even unlicensed, might be too fatigued to get right back into the vehicle. And indeed, we know that Mr. Herrera was undoubtedly that fatigued, as the criminal enterprise for which he was hired by Mr. Jesurum required that he *keep on going*, even though he complained on at least one occasion that he was tired and needed to sleep. Mr. Jesurum's response was to provide cocaine and sex as a substitute for sleep.

These actions set up a chain of events that ultimately resulted in Mr. Herrera's confusion about where he was and where he was going; his concern about staying "below the radar," thus avoiding passing through a tollbooth for the third time because he feared that might draw attention; and his actions in somehow ending up travelling on the wrong side of the highway into oncoming traffic. Could a jury reasonably conclude that this circumstance – fatigue and confusion leading to fatal errors of judgment behind the wheel – was foreseeable to EAN and/or Mr. Jesurum? As stated previously, I am hard-pressed to imagine any reasonable argument to the contrary.

The circuit concluded that because Mr. Herrera committed a criminal act – he pleaded guilty to manslaughter – his conduct was an intervening and superseding act which cut the causal chain of respondents' negligence as a matter of law. The rule in West Virginia is not as absolute as the court deemed it to be. Although this Court found in *Sergent v. City of Charleston*, 209 W. Va. 437, 549 S.E.2d 311 (2001) that

> the criminal acts of the suspects in pursuing the undercover officers, firing at them, fleeing from the police at a high speed, and swerving off of the road and onto the berm constituted intervening efficient acts which were not foreseeable by Officers Crawford and Hart when they initiated contact with the suspects . . . [and thus] the death of a pedestrian several miles up the road was not foreseeable as a matter of law[,]

*id*. at 446-47, 549 S.E.2d at 320-21, we formulated the legal principle governing the case in a way that left open the possibility of a different conclusion on different facts: "[g]*enerally*, a willful, malicious, or criminal act breaks the chain of causation." *Id.* at 446, 549 S.E.2d at 320 (citing *Yourtee v. Hubbard,* 196 W.Va. 683, 690, 474 S.E.2d 613, 620 (1996) (emphasis added).

Clearly, under the facts and circumstances of the instant case, a jury could reasonably conclude that the catastrophe which ended Mrs. Caudill's life and seriously injured three children – a catastrophe that occurred after Mr. Herrera had pushed himself beyond the limits of his endurance[16] – was foreseeable to both EAN and Mr. Jesurum. Because this issue, as well as the broader issues of negligence and negligent entrustment, were taken away from the jury, I respectfully dissent.

I am authorized to state that Judge Cohee joins in this concurring and dissenting opinion.

---

[16] Two of the petitioners' experts, human factors expert Dr. Kevin A. Rider, and sleep expert Dr. Charles A. Czeisler, detailed how days of long-distance driving will predictably result in driver fatigue, which in turn takes its toll on one's ability to safely drive a vehicle.